WALKER BANK & TRUST COMPANY, a Corporation, Plaintiff,

v.

James J. SAXON, Comptroller of the Currency, and the First National Bank of Logan, of Logan, Utah, a National Banking Association, Defendants.

No. C 137–63.

United States District Court
D. Utah, N. D.
Sept. 30, 1964.

Joseph S. Jones, and C. E. Henderson, of Ray, Rawlins, Jones & Henderson, Salt Lake City, Utah, for plaintiff.

John W. Douglas, Asst. Atty. Gen., Walker E. Anderson, Asst. U. S. Atty., and Harland F. Leathers, Washington, D. C., for defendant James J. Saxon, Comptroller of the Currency.

L. Tom Perry, Logan, Utah, for defendant The First Nat. Bank of Logan.

CHRISTENSEN, District Judge.

This is a declaratory judgment proceeding to test the power of the Comptroller of the Currency to authorize the establishment by a national banking association of a branch bank in a city in which it is situated, where conditions under which State banks are expressly authorized to establish new branches cannot now be met for practical reasons. This question, involving a construction of Section 36(c) (1) of the National

Banking Act, appears to be of novel impression. The published decisions of the Federal courts involve primarily subdivision (2) of the same subsection.[1]

On or about November 9, 1962, the defendant, The First National Bank of Logan, applied to the Comptroller of the Currency for authority to establish a branch bank in the City of Logan, Utah, which is a city of the second class. The defendant bank did not take over an existing bank and, indeed, could not because it was the only bank, other than branches, situated in Logan.

Prior to the Comptroller's authorization for the establishment of a branch by the defendant bank, it had no branch. The plaintiff, Walker Bank & Trust Company, was regularly conducting a customary banking business in Logan through its branch, which it had acquired by statutory merger of Cache Valley Banking Company, a State bank theretofore operating as a unit bank in that city. First Security Bank of Utah, N.A., not a party to this proceeding, also had a branch in Logan. On January 21, 1963, the Comptroller issued his certificate authorizing the defendant to establish and operate a branch in Logan and on that date the latter commenced regularly to transact customary banking business at this branch. Unless precluded from so doing by judgment of this court, it is clear that the defendant bank will continue to operate this branch.

As will be seen from the text in the margin, within the limits of the city, town or village in which a national association is situated, the Comptroller of the Treasury by virtue of subsection (1) of Section 36(c) may authorize the establishment of branches by a national banking association expressly authorized at the time to State banks by State law. With respect to points outside of such municipalities in which the association in question may be situated, subdivision (2) of subsection (c) authorizes the establishment of branches by the national banking association if at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by State law on State banks. The laws of the State of Utah authorize the establishment by a State bank of a branch only if it takes over another existing bank.[2] It has been authoritatively determined that where, as in Logan, there is only one unit bank, as distinguished from

1. 12 U.S.C. § 36(c).

"(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *"

2. Section 7–3–6 Utah Code Annotated, 1953, insofar as material, provides:

"* * * With the consent of the bank commissioner any bank having a paid-in capital and surplus of not less than $60,-000 may establish and operate one branch for the transaction of its business; provided, that for each additional branch established there shall be paid in an additional $60,000 (capital and surplus).

"All banking houses and branches shall be located either within the corporate limits of a city or town, or within unincorporated areas of a county in which a city of the first class is located.

"Except in cities of the first class, or within unincorporated areas of a county in which a city of the first class is located, no branch bank shall be established in any city or town in which is located a bank or banks, state or national, regularly transacting a customary banking business, unless the bank seeking to establish such branch shall take over an existing bank. * * *"

(As amended by Laws of Utah 1957, and 1963. The later amendment, following the authorization here in question, eliminated the necessity of approval of the State branch by the Governor.)

branches, that bank, if it were a State bank, could not establish a branch because there would be no other bank for it to acquire to satisfy the condition imposed by State law.[3]

The defendant Bank argues that by reason of the incorporation of State law in Section 36(c) of the National Banking Act the Comptroller must follow the State law and its construction by the State Supreme Court in acting upon applications for branches of national banks;[4] that the Utah law prohibits the establishment of a branch bank by any other bank under the existing conditions,[5] and that the establishment and operation of a new branch, therefore, are not "at the time expressly authorized to State banks by the law of the State in question".[6] The defendants maintain that under the laws of the State of Utah a State bank can establish a branch within the city of its main office by acquiring an existing bank and thus State banks are authorized to have branches in such city within the contemplation of 36(c)(1), and that, accordingly, national banking associations may be authorized

by the Comptroller to have branches in such cities in which they are situated upon such conditions as may be provided by the Federal law and the regulations of the Comptroller. The Comptroller further contends that even with respect to a national banking association seeking to establish a branch outside of a city, town or village in which it is situated, the only condition of State law with which there would have to be compliance under § 36(c)(2) would be with respect to "location".[7]

■ It is my opinion that under the laws of the State of Utah as declared by Section 7-3-6, Utah Code Annotated, 1953, and interpreted by Walker Bank & Trust Company v. Taylor, 390 P.2d 592, supra, the establishment and operation of new branches within the limits of the city, town or village in which a State bank is situated, are "expressly authorized" to State banks within the contemplation of Section 36(c)(1), Title 12 U.S.C., and that therefore the Comptroller had power to authorize the establishment of a branch by the defendant Na-

---

3. See Walker Bank & Trust Company v. Taylor, 15 Utah 2d 234, 390 P.2d 592 (1964), in which it is said, p. 595: "It necessarily follows that State Bank of Provo cannot establish a branch within that city because there is no other existing unit bank [although there were branches of two outside banks as in Logan] which it could take over. Possibly, this might seem unreasonable but it cannot be deemed absurd. * * *"

4. Citing National Bank of Detroit v. Wayne Oakland Bank, 6th Cir., 252 F.2d 537 (1958), cert. den. 358 U.S. 830, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958); Commercial State Bank of Roseville v. Gidney, D.C.D.C., 174 F.Supp. 770 (1959), aff'd. per curiam, Gidney v. Commercial State Bank of Roseville, 108 U.S.App.D.C. 37, 278 F.2d 871 (1960); Suburban Trust Company v. National Bank of Westfield, D.C.D.N.J., 211 F.Supp. 694 (1962), and 222 F.Supp. 269 (1963); State of South Dakota v. National Bank of South Dakota, D.C.S.D.S.D., 219 F.Supp. 842 (1963).

5. Walker Bank & Trust Company v. Taylor, 15 Utah 2d 234, 390 P.2d 592, supra.

6. The plaintiff on the latter point quotes from National Bank of Detroit v. Wayne Oakland Bank, 6 Cir., 252 F.2d 537, 540, supra: "The history of federal legislation regarding branch banking and the statutes applying thereto leave a clear and definite impression that Congress intended, with respect to the location of branches, that a national bank should have no greater rights than it would if it were a state bank"; from Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770, 774, supra: "Congress has adopted state law on the establishment of branches by state banks as the measuring stick for the establishment of branches by national banks"; and from State of South Dakota v. National Bank of South Dakota, S.D.S.D., 219 F.Supp. 842, at 846, supra, that: "state law is adopted by the federal government and made the measuring stick by which it is determined whether national banks may establish branches."

7. It is unnecessary to pass upon the last mentioned contention except as it may throw light upon the proper interpretation of subdivision (1) of subsection (c).

tional Banking Association in the City of Logan. My reasons are these:

 It is an undeniable fact that there is "express authority" under the laws of the State of Utah for State banks to establish branches in the City of Logan.[8] The plain meaning of subdivision (1) of 12 U.S.C. § 36(c), and the contrasting provisions of subdivision (2), applicable to other situations, reinforce this construction.[9] There is a presumption that Congress did not intend the provisions of subdivision (1) to be superfluous or to make the provisions of subdivision (2) applicable to the situation covered by subdivision (1).[10] The legislative history of the 1927 amendment incorporating subdivision (1) in the National Banking Act, in contrast to the legislative history of the new provision incorporated by the 1933 amendment and now set out in subdivision (2) is persuasive that Congress did not intend to apply the same conditions.[11] The deci-

8. The first sentence quoted from the state statute in footnote 2 is general express authority for the establishment of branches by State banks. That there are conditions for such establishment, including the consent of the bank commissioner, capitalization requirements and, in certain cities and under specified conditions, the acquisition of another bank, does not change the "express authority" into a lack of authority on the part of State banks or a lack of a statutory expression of such authority, and does not add to the Federal statute a requirement that compliance be made by National banks with all State conditions.

9. Subdivision (1) refers only to the condition "if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question;" while subdivision (2) adds, among other things, the additional qualification that such establishment of branches by national banking associations shall be "subject to the restrictions as to location imposed by the law of the State on State banks. * * *"

10. "A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error." 2 Sutherland Statutory Construction, 3rd., § 4705, p. 339 (1943).

11. Prior to approval of the Act of Feb. 25, 1927, the Comptroller of the Currency had issued a number of permits to national banks authorizing the establishment by them of additional offices in the same city in which the banks were located. These permits were issued under authority of the National Bank Act as construed by the Attorney General in opinions rendered May 1, 1911, and October 2, 1923, respectively. No permit was issued to any national bank located in a State "where State banks were not permitted to operate branches." Instructions for the Comptroller of the Currency, at p. 518 (1928) [Doc. No. FR 1–12:-914–927].

In Senate Report No. 473, 69th Cong., 1st Sess., [Serial Set. 8524], p. 8 concerning the proposed amendment to the National Bank Act upon which subdivision (1) later was based (Act of Feb. 25, 1927), it is stated: "Your Committee is in agreement with the fundamental branch banking policy of the House bill by which branch banking in the future would, in the Federal Reserve system be restricted to the confines or the limits of the city in which the parent bank is situated." When Congressman McFadden submitted H.R. 2, which ultimately became the predecessor of 12 U.S.C. § 36 (c) (1), to the whole House, he stated that the branch banking policy of the Bill was to: " * * * confine all branch banking within the national banking system to city limits and to prohibit national banks from establishing any branches in States which prohibit State banks from exercising this power. H.R.Rep. No. 83, 69th Cong., 1st Sess. 4 (1926)." And in its report to the Senate the Senate Committee on Banking and Currency stated that: "Under the House bill national banks would be permitted to keep the branches they now have, branch banking would be permitted for national banks in cities * * * where State banks can have branches, and national banks would be denied the right to have branches at all in any State which denied to State banks the right to have branches. * * *". S.Rept. 473, 69th Cong., 1st Sess. 10.

This limitation was applicable until by the Act of June 16, 1933, Congress added subdivision (2) to Section 36(c) providing for branching by national banks outside of villages, towns and cities where they were situated. As might be expected in such a departure from the long

sions relied upon by plaintiff (see footnote 4) to emphasize the controlling effect of the conditions specified by State law are constructions of subdivision (2) and no decision involving an interpretation of subdivision (1) has been cited. The limiting construction urged by plaintiff does not appear in harmony with the essential character of the national banking system and its supervision by the Comptroller of the Currency, as in principle it would subject national banks to State regulation where Congress has not so provided.[12] The administrative interpretation of the Act by the Comptroller since 1927 has uniformly supported the position sought to be sustained by defendant, and his ruling as evidenced by the certificate in question also is entitled to weight, even though not binding upon the court.[13] The legislative history of branch banking in the State of Utah demonstrates the distinction between the prohibition or non-expression of policy as to branch banking, on the one hand, and the granting of express authority for branch banking, conditionally or un-

conditionally, on the other.[14] While it is unnecessary at this time to pass upon the broader argument of the Comptroller that even under subdivision (2) State statutory conditions as to "location" are the only ones applicable to the establishment of branches of national banks, it seems rather apparent that subdivision (1), containing no such limitation, should not be interpreted even more restrictively.

Finally, it would be especially incongrous in view of all of these considerations, to hold that while the plaintiff State bank, heretofore expressly authorized under subsisting State law, continues to carry on branch banking in Logan City, a national bank situated in the same city could not be authorized by the Comptroller to conduct a branch banking business there.

■ In view of the foregoing ruling it is not necessary to pass upon the contentions of the defendant bank that as a mere competitor the plaintiff has no standing to bring this suit; that under the particular circumstances of this case

existing federal policy of limiting branches of national banks to the cities where the parent banks were situated a previous fundamental policy, the branches located outside such cities had to comply with additional conditions, particularly with any State limitations as to location. It seems to me that the legislative history of the 1933 amendment makes clear the distinction between the requirements of the two subsections.

12. See Rushton ex rel. State Banking Commissioner v. Michigan Nat. Bank, 298 Mich. 417, 299 N.W. 129, 134, 136 A.L.R. 458 (1941); cf. State of South Dakota v. National Bank of South Dakota, D.C. S.D., 219 F.Supp. 842 (1963), supra. National Banks exist wholly by virtue of Federal law. Davis v. Elmira Sav. Bank, 161 U.S. 275, 16 S.Ct. 502, 40 L. Ed. 700 (1896). "National banks are quasi-public institutions, and for the purpose for which they are instituted are national in their character, and, within constitutional limits, are subject to the control of Congress, and are not to be interfered with by state legislative or judicial action, except so far as the lawmaking power of the government may permit." Van Reed v. People's Nat.

Bank, 198 U.S. 554, 25 S.Ct. 775, 776, 49 L.Ed. 1161 (1905). See also Mercantile Nat. Bank at Dallas v. Langdeau, 371 U.S. 555, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963).

13. Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

14. Thus, in Walker Bank & Trust Company v. Taylor, 390 P.2d 592, at 594, supra, the Utah Supreme Court among other things said: " * * * The legislative history of branch banking is of great significance. In 1911, the legislature enacted a statute which absolutely prohibited branch banking. It was not until 1933 that the legislature relaxed this prohibition and permitted branching under certain conditions and circumstances. During the period between 1911 and 1933 the legislature evident was of the opinion that branch banking was not in the public interest, possibly because it might impair the stability of the existing banks. This reasoning could well have influenced the lawmakers when they saw fit to allow branch banking, but only under certain restrictive conditions. This legislative history lends support to the proposition that what our branch banking laws do not permit they prohibit."

plaintiff is estopped from questioning the maintenance of defendant's branch in Logan, and that the State statute as restrictively interpreted in Walker Bank & Trust Company v. Taylor, 390 P.2d 592, supra, violates the Constitutions of the United States and the State of Utah. And of course it is not the province of the court to review the exercise of the Comptroller's discretion acting, as he did, within his statutory powers.

A form of declaratory judgment in harmony with the views herein expressed adjudging that the Comptroller acted within his authority in authorizing the establishment and operation of the branch in question and dismissing plaintiff's complaint, with costs to the defendants, may be served and submitted by counsel for the defendants.