W. M. JACKSON, as Superintendent of Banks of the State of Georgia, Plaintiff,

v.

FIRST NATIONAL BANK OF VALDOSTA, a National Banking Association, Defendant.

FIRST STATE BANK OF VALDOSTA, GEORGIA, Plaintiff,

v.

FIRST NATIONAL BANK OF VALDOSTA, GEORGIA, Defendant.

Civ. A. Nos. 647, 671.

United States District Court
M. D. Georgia,
Valdosta Division.

Sept. 2, 1965.

Benjamin L. Johnson, G. Wesley Chennel, Asst. Attys. Gen., Atlanta, Ga., for plaintiff Jackson.

Perry, Walters & Langstaff, Albany, Ga., for plaintiff First State Bank of Valdosta, Ga.

J. Lundie Smith, Cam U. Young, Jr., Valdosta, Ga., for defendant.

BOOTLE, Chief Judge.

These are actions seeking a declaration that the defendant bank cannot lawfully operate a drive-in banking facility recently erected by it and an injunction against further operation thereof. Civil Action No. 647 was removed from the Superior Court of Lowndes County, Georgia to this court. The plaintiff in that action is W. M. Jackson, Superintendent of Banks of the State of Georgia, and this court dismissed that suit for "want of a proper party plaintiff". That ruling was reversed. Jackson v. First National Bank of Valdosta, 349 F.2d 71 (5th Cir. July 22, 1965).[1]

1. First State's standing to sue is beyond cavil. See National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6th Cir. 1958); Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (D. C.1959), aff'd per curiam, 108 U.S.App. D.C. 37, 278 F.2d 871 (1960); Suburban Trust Co. v. National Bank of Westfield,

Thereafter that plaintiff adopted and now urges the motion for summary judgment filed and urged by the plaintiff in Civil Action No. 671, the First State Bank of Valdosta. By consent, the two cases have been consolidated. The defendant has abandoned its defense of laches pleaded in Civil Action No. 671 so that now the contentions of the two plaintiffs are the same and give rise to the same legal question.

The main banking house of the defendant First National Bank is located at the northwest corner of North Patterson Street and West Hill Avenue—North Patterson Street running north and south and West Hill Avenue running east and west.[2] In May, 1961 the defendant also established in the City of Valdosta a "bank office" at which it does a general banking business. This office is located approximately two miles from the main banking house and is currently in full operation as it has been since the date of its establishment. On July 14, 1964, the defendant established and opened a "drive-in-facility" at the northeast corner of the intersection of West Hill Avenue and North Toombs Street. As shown by the attached plat it is 290.57 feet from the rear wall of the main banking house to the rear wall of the drive-in structure. This "drive-in-facility" is currently in operation and customarily cashes checks and receives deposits. The plaintiffs have no quarrel with defendant's establishment and operation of the main banking house and the "bank office." They take umbrage, however, at

defendant's establishment and operation of the "drive-in-facility". They contend that this facility has been opened and exists in contravention of applicable federal law. This court has before it now the plaintiffs' motion for summary judgment with supporting papers, all in accordance with Fed.R.Civ.P. 56. Having been fully advised in the premises by able counsel on both sides, this court now undertakes the task imposed upon it by law—to resolve the conflict presented and to declare the rights of the parties so that they may intelligently chart the course of their future conduct.

█ Banking so vitally touches the lives of so many that it has long been the policy of the law both federal and state to regulate it in broad outline and also in right much detail. That policy is firmly established. See e. g., Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (D.C.1959). Its wisdom is hardly to be questioned. The broad question which this court must decide is whether the conduct of the defendant in establishing and operating the "drive-in-facility" in question contravenes valid legal proscription. We are forced to conclude that it does.

The exclusive authority for the establishment and operation of a branch or branches by a national banking association is found in 12 U.S.C.A. § 36. Only a portion of § 36 is applicable to the present case—§ 36(c) (1)[3] and § 36(f).[4] While it is clear that federal law is controlling in this type case, it is also clear from a reading of § 36(c) (1) that that

211 F.Supp. 694 (D.N.J.1962); Whitney National Bank v. Bank of New Orleans & Trust Co., 116 U.S.App.D.C. 285, 323 F.2d 290 (1963).

2. A copy of a plat which plaintiff introduced at the taking of William L. Goodloe's deposition is attached to and is hereby incorporated by reference in this memorandum. [See Appendix.] This plat, which gives a clear picture of the area surrounding the structure in dispute, will be referred to from time to time as the "attached plat".

3. "(c) A national banking association may, with the approval of the Comptroller of

the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; * * *."

4. "(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent."

particular subsection derives its implementation from "the law of the State in question." Here the federal law makes the state law a part of itself. The Georgia law sets forth and defines four terms which are in some degree germane to the issues involved here. These terms are: (1) Parent bank,[5] (2) branch bank,[6] (3) bank office [7] and (4) bank facility.[8] The main banking house of the defendant fits the definition of "parent bank" and while its existence is in no way dependent on state law, its ability to establish and operate a branch as defined in 12 U.S.C.A. § 36(f) is by Act of Congress, 12 U.S.C.A. § 36, made dependent thereon. It is necessary therefore, for purposes of analysis, to term the main banking house of defendant a "parent bank." The term "branch bank" as defined by Georgia law is of little interest here since it describes only a place of business in a city *other than* the city wherein the parent bank is chartered.[9] Sections 13–203.1(a) and (b) of the Georgia Code authorize a "parent bank" to establish and operate a "bank office" and/or a "bank facility". However, § 13–203.1(c) contains an important limitation on the extent of this authority. It states as follows:

"Without limitation, on the foregoing and in furtherance thereof,[10] the Superintendent of Banks may

approve with respect to any particular city, town, or village now or hereafter having a population of 80,000 or under, according to the 1960 official United States census or any future official United States census, not more than one of either a bank office or bank facility for each population unit of 40,000 or any fraction thereof, according to the 1960 official United States census or any future official United States census for any parent bank or branch bank: Provided, nevertheless, that this limitation shall not apply to parent banks or branch banks in municipalities with a population of more than 80,000 according to the 1960 official United States census or any future official United States

States census. * * * "

It is stipulated by the parties that Valdosta has a population of 30,652 according to the 1960 official United States census—the last official census. With the facts as they are—and no dispute exists as to any material fact—the defendant bank is entitled to only one of either a "bank office" or a "bank facility" if such structure would fall within the definition of "branch" as set out in 12 U.S.C.A. § 36(f). The defendant

5. Ga.Code Ann. § 13–201.1(a): "The term 'parent bank' as used in this Title means the principal place of business where the general business of each bank shall be transacted in the particular city, town, or village specified in its charter."

6. Ga.Code Ann. § 13–201.1(b): "The term 'branch bank' as used in this Title means any additional place of business of any parent bank not located in the particular city, town, or village where its parent bank was chartered."

7. Ga.Code Ann. § 13–201.1(c): "The term 'bank office' as used in this Title means any additional place of business of a parent bank or a branch bank located in the particular city, town, or village in which said parent bank or branch bank is situated and which has obtained a permit to operate a complete banking service in the manner and under the conditions hereinafter provided."

8. Ga.Code Ann. § 13–201.1(d): "The term 'bank facility' as used in this Title means any additional place of business of a parent bank or a branch bank located in the particular city, town, or village in which said parent bank or branch bank is situated and which has obtained a permit to operate a limited banking service in the manner and under the conditions hereinafter provided."

9. It is noteworthy that new or additional branch banks are completely proscribed by Georgia Law. Ga.Code Ann. § 13–203(c).

10. This phrase "without limitation on the foregoing and in furtherance thereof" obviously has reference only to the first two sentences of sub-section (c) (not quoted above) and was not intended to be read in expansion of the authority found in sub-sections (a) & (b).

"parent bank" has, without a doubt, already established and begun operating a "bank office" some two miles from its main banking house. Consequently, if the defendant were a state bank it would not be able to establish and operate another "bank office" or "bank facility" until Valdosta was determined by an official United States census to have experienced the required increase in population. If the defendant's "drive-in-facility" is a "branch" as defined in 12 U.S.C.A. § 36(f) then such facility is in existence contrary to federal law. This follows since the one "bank office" or "bank facility" which the federal statute (12 U.S.C.A. § 36(c) (1)), implemented by the law of Georgia, permits has already been constructed and put into operation by the defendant and the "drive-in-facility" clearly comes within the Georgia definition of a "bank facility."

 This court is convinced that in construing the definition of "branch" found in 12 U.S.C.A. § 36(f) it should be guided by federal considerations. In other words "branch" should be defined according to federal law. See Comment, 32 U.Chi.L.Rev. 148 (1964). This premise is not, however, essential to the conclusion which we reach on this point since regardless of the legal background against which § 36(f) is read, the broad wording of that section constrains the mind to only one result—the "drive-in-facility" here in question is covered by § 36(f). Coverage of this "facility" is found without placing any undue strain or abnormal construction on the wording of § 36(f). The sub-section uses *inter alia* the wording "additional office" or "any branch place of business". It seems to this court that either of the terms, "additional office" or "branch place of

business", is sufficiently broad to cover the facility in question.[11] After stating the above terms, the sub-section ends with this language: "at which deposits are received or checks paid, or money lent." The patent meaning of this part of the statute is that an "additional office" or "branch place of business" will be considered a "branch" for purposes of § 36 if any one of the three specified conditions is met, i. e., if deposits are received *or* checks are paid *or* money is lent. While only one of these conditions is necessary for coverage, two of them are conclusively shown to be present in the instant case. It is stipulated at page two of the pre-trial order that customarily checks are cashed and deposits are received at the "drive-in-facility". The deposition of William L. Goodloe, Chairman of the Board and Past President of the defendant bank, confirms this fact. He stated at page nine of the deposition that the authority which employees at the "drive-in-facility" possess is to accept deposits and cash checks.[12] With the definition in § 36(f) as broad as it obviously is and with the factual requisites for its application so conclusively established, this court would be acting legislatively if it were to find non-coverage.

 Notwithstanding the apparent literal coverage of § 36(f), this court is urged to adopt the position that "branch" as defined in § 36(f) was not meant to cover a situation such as this one where merely "an expansion of an existing facility" is involved and the problem is one of only *de minimis* proportions. The comptroller of the currency felt that this was the case and that since the "drive-in-facility" would "be in *unity of operation* with the present main office" there was no need nor requirement for issuance of

---

11. But see, Michigan National Bank v. Saxon, C.A. 821–62 (D.C.1962) p. 7 Official Transcript, where the court felt that "the only possible phase that could apply to * * * [a] drive-in facility * * * [was] the phrase 'additional office' ".

12. This deposition reveals also that some new accounts are perhaps opened at the "drive-in-facility" even though there is no "express" authority for such transactions.

a certificate authorizing a "branch." [13] (Emphasis added). Several factors compel rejection of that approach in this case.[13A] These factors fall roughly into four categories: (1) the distance separating the main banking house and the "drive-in-facility", (2) the number of intervening structures, (3) the lack of physical connection between the main banking house and the "drive-in-facility", and (4) the economic effect of the "drive-in-facility" on the balance of competition between the plaintiff bank and defendant bank. The details of the first three categories set out above may be gleaned from the attached plat. The plat shows a separation distance of 290.57 feet. It further shows that there are ten (10) buildings containing businesses and an alley all of which intervene between the main banking house and the "drive-in-facility". Five of the ten intervening buildings are composed of three (3) stories, while the other five consist of one (1) story only. The one story building which houses Futch Appliance Company is owned by the defendant bank. The plat also indicates that there is no physical connection whatsoever between the main banking house and the "drive-in-facility". This conclusion is borne out by Mr. Goodloe's deposition at page 11 where he states that the only connection between the two structures is the telephone. The details of the fourth category, i. e., economic effect on the balance of competition, are found in the affidavit submitted by Mr. Rea Steele, President of the plaintiff bank, and the deposition of Mr. William L. Goodloe. The pertinent portions of these two sworn documents are entirely consistent with each other and demand the conclusion that the presence or absence of the disputed "drive-in-facility" will have a substantial and not a *de minimis* effect on the balance of competition between these two rival banking institutions. At pages six and seven of Mr. Steele's affidavit he states that due to the "drive-in-facility" the defendant bank "has and will *gain* a substantial number of customers \* \* \* [and] that it has *retained* \* \* \* a number of customers who would have changed their business to the First State Bank \* \* \*." (Emphasis added). Mr. Steele estimates the loss to his bank as approximately $1,500 to $2,000 a year. A reading of Mr. Goodloe's deposition, pages 22–25, indicates that he concurs with Mr. Steele in the opinion that without the "drive-in-facility" the defendant bank would *lose* customers and with it the bank has *gained* customers. It seems clear that if the disputed structure is allowed to stand the plaintiff bank will suffer a substantial *loss* in its competitive position and that the correlative *gain* will inure to the defendant bank.

In respect to the "lack of physical connection", the Comptroller of the Currency apparently feels that the concept of "unity of operation" is sufficient to sustain the facility in question. He apparently feels that this concept is apposite where the two locations (main banking house and drive-in-facility) are likely to be treated as *one* in the public mind, and the bank is enabled to provide convenience for its customers and to maintain its competitive position. (See letter from Deputy Comptroller to William L. Goodloe, dated June 14, 1963 and attached to the Goodloe deposition as plaintiff's Ex. –2). This court feels that the concept "unity of operation" is too pliable and amorphous to be accepted here in support of the position that the disputed "branch" apparently covered under § 36(f) is really not a "branch" but is in effect an "expansion of an existing facility", namely, the main bank-

13. See letter from Deputy Comptroller of the Currency to Mr. William L. Goodloe, dated June 14, 1963, and attached to the Goodloe deposition.

13A. It should be noted that the state regulations would not permit the type of expansion found in this case. (See stipulation of parties). If such permission had been present then this case would not be before this court.

ing house of the defendant. We feel that this is consistent not only with the letter of § 36(c)(1) but also with the spirit of said statute. If in fact an interstice exists in this area of the statute law, this court would not feel justified in filling it with such a nebulous concept as "unity of operation." The history of preserving the balance of competition between the two rival banking systems with some sort of definite guidelines militates strongly against such a position. Also in respect to this question of "physical connection" much has been said about the presence or absence of a pneumatic tube between the two structures. Several State Attorneys General have struggled with the proposition and have reached varying results. See, e. g., Op. of Neb. Attorney General 241–54 (1954—approving such arrangement) and Op. of S. D. Attorney General rendered August 2, 1964 disapproving such an arrangement as "insubstantial". While the presence or absence of a pneumatic tube is perhaps a relevant factor for consideration, the absence of such a tube is *not* a controlling fact in the case *sub judice*. This court has considered *all* of the factors listed and discussed above.

■■ There is a paucity of authority on the question faced in this case. There have been a considerable number of cases [14] construing § 36(c)(2) [15] the wording of which differs from § 36(c)(1). While these cases are obviously not squarely in point, a reading of them suggests that § 36(c) should be read in a manner which will preserve a healthy state of competition between the two rival banking systems—federal and State. In fact, this policy is suggested by the very wording of the statute which specifically refers to the State law in question. Furthermore § 36(c)(1) uses this language: "[I]f *such establishment and operation* are *at the time* expressly authorized to State banks * * *." (Emphasis added). The emphasized language indicates that a national banking association should not be permitted a "branch" if a State bank would not be permitted a similar "branch". That is, a national banking association should not be allowed to establish and operate a specific "branch" if a State bank could not. In the case at bar, it seems clear that the plaintiff bank could not, consistent with Georgia law, have done what the defendant national bank has done. The defendant makes much of the difference in the wording between § 36(c)(1) and § 36(c)(2), contending that since § 36 (c)(1) does not contain the restriction on location found in § 36(c)(2) it, (§ 36 (c)(1)), should not be read so restric-

---

14. See e.g., Michigan National Bank v. Gidney, 99 U.S.App.D.C. 134, 237 F.2d 762 (D.C.1956—refusing to permit the branch); National Bank of Detroit v. Wayne Oakland Bank, 252 F.2d 537 (6th Cir. 1958—refusing to permit the branch); Commercial State Bank of Roseville v. Gidney, 174 F.Supp. 770 (D.C.1959—refusing to permit the branch), aff'd per curiam, 108 U.S.App.D.C. 37, 278 F.2d 871, (D.C.Cir. 1960); Community National Bank of Pontiac v. Gidney, 192 F. Supp. 514 (E.D.Mich.1961—merits of question not reached), aff'd Community National Bank of Pontiac v. Saxon, 310 F. 2d 224 (6th Cir. 1962—some discussion of § 36(c)); Suburban Trust Co. v. National Bank of Westfield, 211 F.Supp. 694 (D. N.J.1962—ruled on standing to sue but discussed § 36(c)(2)), 222 F.Supp. 269 where an interesting result was reach-

ed in that the National Bank was permitted a branch and the State Bank was not; State of South Dakota v. National Bank of South Dakota, 219 F.Supp. 842 (D.S.D.1963—held State had no standing to sue but discussed § 36(c)).

15. "(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: * * * (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks. * * *"

tively. This argument, based on the difference in wording between the two subsections, loses some vitality when it is recalled that § 36(c) (1) was enacted in 1927 and § 36(c) (2) in 1933. If they had been enacted concurrently, it may be that the difference in language would have more significance. However, the court, in Walker Bank & Trust Co. v. Saxon, 234 F.Supp. 74 (D.Utah 1964), felt that the wording was significant and that § 36(c) (1) should therefore be given a more liberal construction. In that case the court was squarely presented with a question under § 36(c) (1) similar to the one in the instant case. A national banking association sought, pursuant to § 36(c) (1), to establish and operate a "branch" in the same city in which it was located.[16] The Utah law required a State bank seeking such a branch to take over an existing bank, which condition the national bank found impossible to comply with since it was the only bank, other than branches, situated in the city. The district court construed § 36(c) (1) and held that the national banking association could establish its branch. The court felt that the "express authority" called for in § 36(c) (1) was present in the Utah law. The requirement that an existing bank be taken over was termed a "condition" and not applicable to national banks under § 36(c) (1).[17] Apparently the court was holding that once it is determined that the State in question grants general express authority for the establishment of branches, the national banking associations are *ipso facto* freed from any "conditions" of the State law. This court cannot adopt such a reading of § 36(c) (1) in conjunction with the definitional provisions of § 36(f).[18] Such a construction seems contrary to the considerations

discussed supra. We think a sounder view was expressed in Commercial Security Bank v. Saxon, 236 F.Supp. 457 (D.C.1964), which rejected the Walker case and held "that the exact standards of the [state] branching law must be applied * * *." Id. at 461. That court took the position that in dealing with the dual banking system "there must be a competitive equality in at least the most important areas of competition between the two systems." Id. at 460. We fully agree with that position and with the following statement: "Of course, states could prevent this situation by liberalizing their branching laws, but the Court does not feel that this pressure on state legislatures was intended." Id. at 461. We are aware that this case is not exactly the case which we have under consideration since the court in Commercial Security was not faced with the "expansion of an existing facility" and *de minimis* arguments. We feel, however, that it lends support to the position· which we have taken.

By way of recapitulation we feel that the "drive-in-facility" of the defendant is in existence contrary to valid legal proscription. We so conclude since the Georgia State law would not permit *such* establishment and operation to a State bank and since we feel that the structure in question is not merely an "expansion of an existing facility" but is a "branch" as defined in 12 U.S.C.A. § 36(f). We have also considered defendant's other points, including its ingenious argument on the alleged non-retroactivity of the Georgia statutes and have found them without merit.

Let counsel for plaintiffs prepare a decree in accordance herewith and submit it to opposing counsel who shall have five days for suggestions as to form.

---

16. This is generally referred to as an "inside" branch. If the branch is sought under § 36(c) (2) then it is termed an "outside" branch.

17. 234 F.Supp. at 78 N. 8.

18. The broad interpretation made by the court as well as the facts in Walker, supra, rendered it unnecessary for the court to deal with § 36(f). Also the legislative history discussed by the court seems somewhat inconclusive.

Appendix

NORTH TOOMBS STREET

FIRST NATIONAL BANK "DRIVE-IN" BUILDING — 90' — 54.5'

35.6'

FUTCH APPLIANCE CO. — 25.55

OPEN — 4.50'

IMPERIAL FINANCE CO. — 20.25'

CHAMBER OF COMMERCE — 19.76'

VALDOSTA MUSIC CO. — 36.80'

VACANT — 24.70'

SPORTSMAN CLUB — 22.86'

WESTERN UNION — 21.01'

STAIRS

SORRELS & MARTIN — 20.90'

SORRELS & MARTIN STORAGE — 24.80'

ATLANTA GAS LIGHT CO. — 27.20'

— 90' —

ALLEY

ONE STORY BUILDINGS

THREE STORY BUILDINGS

FIRST NATIONAL BANK MAIN BUILDING TWO STORY — 40.5'

MAIN ENTRANCE — 40.5'

90.92'

WEST HILL AVENUE

SIDEWALK

153.41'

390.57'

121.80'

NORTH PATTERSON STREET

PLAT SHOWING FIRST NATIONAL BANK OF VALDOSTA, GEORGIA, MAIN BUILDING IN RELATION TO FIRST NATIONAL BANK "DRIVE-IN" BUILDING, LOCATED ON W. HILL AVENUE & N. TOOMBS STREET, VALDOSTA, LOWNDES COUNTY, GEORGIA, 9 OCT. 1964 ------- SCALE 1" = 30'

OLIVER G. ALTMAN

GEORGIA

EXHIBIT "A"