**Edward D. DUNN, Superintendent of Banks of the State of Georgia**

v.

**The FIRST NATIONAL BANK OF CARTERSVILLE, and William B. Camp, Comptroller of the Currency of the United States.**

**Civ. A. No. 2375.**

United States District Court, N. D. Georgia, Rome Division.

June 28, 1972.

David B. Poythress, Asst. Atty. Gen., Atlanta, Ga., for petitioner.

Neel & Smith, Cartersville, Ga., for First Nat. Bank.

Beverly B. Bates, Asst. U. S. Atty., Atlanta, Ga., for Comptroller of Currency.

## ORDER

O'KELLEY, District Judge.

Petitioner herein is the Superintendent of Banks of the State of Georgia and is charged with enforcement of the banking laws of the State of Georgia. Superintendent W. M. Jackson has retired since the filing of this action and Edward D. Dunn, his successor, has been substituted as plaintiff. Pursuant to his obligations, the petitioner has instituted this injunctive proceeding against The First National Bank of Cartersville, alleging that the maintenance by this defendant of more than two of either bank offices or bank facilities in addition to its main office within the limits of Bartow County, Georgia, is a direct violation of 12 U.S.C. § 36 and Georgia Laws 1970, p. 954, 958 (Ga.Code Ann. § 13–203.1). By Order of this Court, and on his motion, the Comptroller of the Currency of the United States was joined as a party defendant. Both defendants have moved the Court to dismiss or in the alternative for summary judgment. The grounds for these motions are based on the Comptroller's determination on April 30, 1963 that the First National "installment loan building" was to be viewed, ". . . as an extension of the main banking premises," and was not an addition. The defendants assert that this decision was reasonable and in accordance with law and that the defendants are now entitled under Georgia law to a second additional banking facility.

The sole issue before the Court for consideration is whether the installment loan building qualifies as a branch bank under the definition of "branch" as seen at 12 U.S.C. § 36(f). This decision will determine the validity of the recently authorized branch under construction in the Plaza Shopping Center in Cartersville.

The First National Bank of Cartersville was first chartered in 1889, and now has its main office on the southeast corner of the intersection of West Main Street and South Erwin Street in Cartersville.

In 1961, with approval of the Comptroller of the Currency, the Bank opened a drive-in, walk-up branch at 104 South Tennessee Street in Cartersville, approximately three city blocks from its main office. This branch provides deposit and checking services only, but this is a "branch bank" within the meaning of 12 U.S.C. § 36(f). Formal notice of the opening of this branch was given to the Superintendent by the Comptroller.

In 1963, the Bank moved a part of its operations into the structure known as the installment loan building, directly across South Erwin Street from the main office. In a letter dated April 30, 1963, the Comptroller advised the Bank's president that his "proposal" to construct and operate the installment loan building was,

"approved . . . *as an extension of the main banking premises,* and that certification by this [Comptroller's] office is neither issued nor required." [Emphasis added.]

The primary function carried on in the installment loan building is the opening and processing of installment loan accounts, although occasionally deposits are received and checks are accepted and paid. The only physical connections between the installment loan building and the main office are telephone lines and an underground pneumatic tube. The Comptroller gave no notice to the Superintendent concerning this expansion; however, there is evidence that extensive radio and newspaper advertisement revealed such occurrence.

On April 7, 1971, the Bank applied to the Comptroller for approval to open a full service branch bank in the Plaza Shopping Center, approximately 1.25 miles from the main office. On April 9, 1971, the Comptroller notified the Superintendent of the application; and on April 20, 1971, the Superintendent notified the Comptroller of his objection to

the proposed branch. In an opinion dated September 23, 1971, the Comptroller rejected the contentions of the Superintendent; and on September 27, 1971, the Comptroller approved the proposed branch.

The pertinent code section under Georgia law which allows for branch banks appears in Ga.Code Ann. § 13–203.1 (1970 Amend.):

"(b) A parent bank or a branch bank . . . may . . . establish and operate a bank office or offices within the same county in which said parent bank or branch bank is situated."

The provisions for establishing branch banks are based on a population scale. Within a county of 120,000 population or less, one (1) additional branch office or facility may be approved for each population unit of 20,000, or any fraction thereof. Based on the 1970 U.S. population census, Bartow County (the site of Cartersville) had a population of 32,663; and accordingly, parent banks are limited in that county to two branch offices or facilities. This conclusion is obvious and the parties so agree, but the disagreement arises in the parties' interpretation of what constitutes a "branch bank."

The plaintiff alleges that the installment loan building, which was established in 1963, is a branch bank; thus, the defendant's subsequent application for the Plaza branch is a "third" addition and a violation of Georgia law. The plaintiff's objection is not to the installment loan building per se, but to the Bank's maintaining a third additional place of business which is alleged to accord it a substantial competitive advantage over state banks in Bartow County. The defendant contends that the installment loan building is not a branch bank; therefore, the Plaza branch is the "second" addition and within the confines of Georgia law.

Under 12 U.S.C. § 36(c), a national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches within the territorial limits established by state law, if the privileges of such establishment and operation are also authorized to state banks by the law of the state in question. In application of this privilege and in determination of what constitutes a "branch bank" under 28 U.S.C. § 36(f), federal law is to be employed. See, First National Bank in Plant City v. Dickinson, Comptroller of Florida, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969), where that Court said,

"Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated. . . But to allow the States to define the content of the term 'branch' would make them the sole judges of their own powers." (p. 133, 90 S.Ct. p. 343)

In support of his allegation that the installment loan building qualifies as a branch bank, plaintiff follows the reasoning in the First National Bank in Plant City v. Dickinson, *supra*, case. In that case, Florida law did not allow for branch banking. A National Bank in Florida had attempted to provide its customers an additional service apart from the main banking office by having an armored car serve as a receptacle for receipt of moneys intended as deposits. In reference to § 7 of the McFadden Act, codified in 12 U.S.C. § 36, which allows a national bank to do only what a state bank can do, that Court found that the armored car was in fact receiving deposits which qualified it as a branch bank. In its reasoning process, the Court weighed heavily in argument of "competitive equality," the status to be protected between the two banking institutions, federal and state. The Court referred to the restrictions which state law placed on the national banking institutions, and emphatically reasoned that this policy is followed in order to maintain a status of competition between the two entities.

Plaintiff further argues that the Comptroller's "unity of operation" theo-

ry was rejected in Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (M.D., Ga.1965). In refusing to recognize that the "drive-in" facility was a mere extension of operation from the main bank office, that Court considered four pertinent factual criteria:

(1) the distance separating the main banking house and the "drive-in-facility," [1]

(2) the number of intervening structures,[2]

(3) the lack of physical connection between the main banking house and the "drive-in-facility," and,[3]

(4) the economic effect of the "drive-in-facility" on the balance of competition between the plaintiff bank and defendant bank.[4] (p. 139)

The Court in the Valdosta case made a detailed study of these physical factors in its determination that, giving equal weight to all relevant criteria, the "unity of operation" was a pliable and an amorphous concept in that situation. That Court also emphasized the "competitive equality" theory; and found that, in light of the existing factors to be considered, the "drive-in-facility" would result in irreparable harm to the status of competition if allowed to be maintained.

This Court finds distinguishable characteristics in the above reasoning when applied to the existing factors in the case, sub judice, as well as other case law authority which casts a different light on the overall picture. A brief survey of this case law will reveal the distinctions.

In the unreported case of Michigan National Bank v. Saxon, Civ. No. 821–862 (D.,D.C.1962), that Court referred to 12 U.S.C. § 36(f) in saying that the particular phrase "additional office" is applicable to this case. The Court further stated,

"It does not mean, however, that every time a bank rents an additional room or additional offices in another building, as banks do sometimes when their business expands, that they are opening a new branch. The words 'additional office' must be reasonably construed as meaning a separate and independent office, operating in the same way as branch banks generally operate, and not merely additional office space to an existing facility.

"Here we have a small structure connected by a pneumatic tube and operating as part of the branch now existing. It seems unreasonable to the Court to call that a separate branch."

That Court concluded that the proposed "drive-in" to be erected about 500 feet from the existing branch was not an "additional office" or "branch" under 12 U.S.C. § 36(f), as this was only an extension to accommodate customers.

In the case of First National Bank of Logan v. Walker Bank and Trust Co., 19 Utah 2d 18, 425 P.2d 414 (1967), that Court said:

"No concrete test comes to mind that could be given to cover all situa-

---

1. (a) The plat in the Valdosta case shows a separation distance of *290.57* feet.
   (b) In the present case, the "loan" building is *40* feet from the main building.

2. (a) There are ten (10) buildings containing businesses and an alley all of which intervene between the Valdosta main banking house and the "drive-in-facility."
   (b) There is a street but no buildings between the "loan" building and the main building in Cartersville.

3. (a) In the Valdosta case, there is no physical connection whatsoever between the main banking house and the "drive-in-facility."
   (b) There is pneumatic tube connecting the "loan" building and the main building in the instant case.

4. (a) In the Valdosta case, sworn documents demanded the conclusion that the presence or absence of the disputed "drive-in-facility" will have a substantial and not a de .minimis effect on the balance of competition between the two rival banking institutions.
   (b) There will be no economic intrusion in the field of competition by the presence of the "loan" building in the Cartersville case.

tions. We believe it necessary to examine the facts and circumstances of each case individually. * * * Any attempt to define additional banking facilities as not being 'branches' if they are established within any given radius of the 'banking house' is met with a variety of problems. No single factor impresses us as being controlling." (p. 417)

That Court considered many of the factors which were considered in *Valdosta, supra,* in concluding that an "addition" must be so separated as not to constitute a contiguous unit operation. See also, the unreported cases of Schneider v. National Bank of Washington, Civ.No. 3402 (W.D.Wash.1970) and North Davis Bank v. First National Bank of Layton, Civ. No. N.C. 47–70 (D.Utah 1971).

Having read and considered all the appropriate authorities, this Court finds that a determination of § 36(f) becomes one of interpretation and not strict construction. A literal reading of § 36(f) might endow any "addition" at which deposits are received, or checks paid, or money lent with the qualification of a "branch"; however, several cases clearly adopt the approach that each situation presents a new and different problem to be resolved only by observing all relevant factors, as opposed to the theory that the conclusion be based on a definitional reading of § 36(f). These cases basically adhere to similar factors in determining interpretation. The factors considered in the *Valdosta, supra,* case, where the "unity of operation" theory was denied, were the same factors, as well as several others, considered by the Comptroller in the case, *sub judice.* The facts of those considerations were different, and it is these distinctions that compel this Court to find distinguishable precedence in the *Valdosta, supra,* case. This Court feels that similar facts would have resulted in a different conclusion

in the *Valdosta, supra,* case. As far as First National Bank in Plant City v. Dickinson, *supra,* is concerned, that decision would infer a literal reading of § 36(f). The basis of that Court's reasoning rested on the "competitive equality" concept, and it is this theory which compels this Court to find distinguishable precedence in that case. That Court reasoned that an armored car used for receiving deposits apart from the main banking office would quite obviously import competitive advantages; however, there is no opportunity for the installment loan building to "travel its services" about town threatening the territories of competitive banks and imposing on customer relations. The maintenance of the installment loan building will not endanger the status of competition between the two banking entities.

The Court is reluctant to conceivably open the floodgates of branch banking innovations; therefore, the Court's decision is made only after considering *all* relevant factors involved. The law is well established that in absence of finding an arbitrary and capricious decision, the Comptroller's discretion must be accorded validity. Sterling National Bank of Davie v. Camp, 431 F. 2d 514 (5th Cir.1970). Thus, in light of the distinguishable facts from the *Valdosta, supra,* precedence, and in light of the Court's finding that there is no competitive imbalance threatened, as well as the lawful discretion exercised by the Comptroller, the Court finds as a matter of law that the "installment loan building" does *not* constitute a branch bank as contemplated by 12 U.S.C. § 36(f). This decision is not intended to establish precedence for expanding the concept of branch banking, but is decided only upon the principle that every case is factually different and must be disposed of only after a full and complete consideration of all relevant factors.