**COMMONWEALTH OF VIRGINIA ex rel. STATE CORPORATION COMMISSION, Plaintiff,**

v.

**FARMERS AND MERCHANTS NATIONAL BANK, Defendant.**

**Civ. A. No. 74–C–31–H.**

United States District Court, W. D. Virginia, Harrisonburg Division.

Aug. 8, 1974.

Andrew P. Miller, Atty. Gen., of Virginia, Anthony F. Troy, Deputy Atty. Gen., C. William Waechter, Jr., Gen. Atty., State Corp. Commission, Richmond, Va., for plaintiff.

Flournoy L. Largent, Jr., Largent, Anderson & Larrick, Winchester, Va., for defendant.

## OPINION and ORDER

TURK, Chief Judge.

The complainant in this action, Commonwealth of Virginia, brings suit on behalf of the Bureau of Banking of the State Corporation Commission to enjoin the operation of a drive-in banking facility operated by defendant, Farmers and Merchants National Bank, in Front Royal, Virginia. Defendant is a national banking association, organized under the National Banking Act, 12 U.S.C. § 21 et seq. (1945). Defendant has its principal office in the City of Winchester, Virginia, and has twelve branches in Virginia, including three branches in Front Royal.

In September, 1972, defendant applied to the Comptroller of the Currency of the United States. for permission to erect a drive-in facility approximately 200 feet from its existing branch office in Front Royal, Warren County, Virginia. On November 9, 1972, the Comptroller of the Currency, after reviewing information supplied by the defendant, advised the defendant that neither approval nor certification for the construction of the drive-in facility was required.[1]

---

[1] Richard J. Blanchard, Deputy Comptroller of the Currency for Mergers and Branches filed the following affidavit in support of the decision:

"I. RICHARD J. BLANCHARD, being duly sworn, depose and say as follows:

1. I am Deputy Comptroller of the Currency for Mergers and Branches, being duly appointed such by the Comptroller of the Currency. I have served as Deputy Comptroller since 1964.

2. I make the affidavit on the basis of my personal knowledge and of the records of the Office of the Comptroller of the Currency.

Defendant then constructed the facility at a cost of approximately $118,000, and in January, 1974, the defendant began operation of the facility at the location proposed to the Comptroller. After defendant commenced operation of the facility, the Commissioner of Banking of

Virginia received from one of defendant's competitors in Front Royal a complaint as to the propriety of the defendant's facility. After investigation, the Commissioner, in March, 1974, advised defendant that the drive-in facility could not be legally operated under the branch

3. On September 22, 1972, Farmers and Merchants National Bank (hereinafter "Farmers"), a national banking association whose main office is located in Winchester, Virginia, requested the approval of the Office of the Comptroller of the Currency for the proposed expansion of its East Main Street branch office located in Front Royal, Virginia.

4. On November 1, 1972, Farmers communicated further information to the Office of the Comptroller of the Currency regarding this proposed expansion.

5. From the information supplied on the above two dates the Comptroller's Office concluded:

(a) The existing premises of Farmers' branch office on East Main Street in Front Royal was inadequate to serve its customers properly;

(b) The branch office had no parking facilities for the use of its customers, who often were forced to park several blocks away and walk that distance to the office to transact business;

(c) The branch office had no facilities for drive-up banking, and thus could not provide its customers with this service, subjecting them to the inconvenience of "horse and buggy day banking" rather than making available the more convenient and efficient drive-in service now routinely provided by many of Farmers' competitors;

(d) Physical modifications to the existing premises of the branch to provide such parking and drive-up facilities and to otherwise ensure adequate customer service were explored by Farmers' architect and builder and found unfeasible;

(e) No other property contiguous to the branch office was available for expansion since existing buildings were unsuitable to satisfy the needs of Farmers' customers;

(f) The only reasonably available premises for expansion was a tract of land located approximately 200 feet from the existing branch, and out of necessity, this was purchased for the purpose of expansion to provide needed customer services;

(g) There were no intervening structures between the existing branch and the tract of land acquired for the expansion;

(h) The additional installation on the tract of land was to be comprised of a parking area and a drive-up structure;

(i) The drive-up structure was to provide only limited banking services to present customers in the same customer service area as the existing branch and immediate building;

(j) All transactions engaged in at the drive-up structure would be processed at the existing branch; and

(k) The drive-up structure would be entirely dependent upon the branch, and only together could they provide complete banking services to Farmers' East Main Street Front Royal customers.

6. In determining whether a proposed additional installation, adjunctive to an existing branch or main office, amounts to the establishment of a branch or merely the establishment of an integral part of the existing office, the Office of the Comptroller of the Currency examines all of the facts and circumstances surrounding the proposed additional installation.

7. The factors weighed by the Office of the Comptroller of the Currency include the distance separating the additional and existing banking service areas, the presence or absence of any intervening structure, the presence or absence of any physical connection between the two installations, and the economic effect of the additional banking service area upon the balance of competition within the banking community. No single factor is controlling.

8. On November 9, 1972, the Office of the Comptroller of the Currency determined, from an examination of all pertinent factors, that the proposed addition to Farmers' East Main Street branch in Front Royal, would be so closely tied to the existing branch structure as to be an integrated part thereof, and that together they would constitute a geographical and functional unity.

9. Based upon this information, therefore, the Office of the Comptroller of the Currency concluded that the addition was a mere extension of the existing branch office rather than a branch separate and apart therefrom, and that consequently, no approval or certification was required. Farmers was so advised."

banking laws of Virginia. Upon defendant's refusal to cease operation of its drive-in facility, plaintiff brought an action for declaratory and injunctive relief under 28 U.S.C. §§ 1331, 1337, 2201, and 2202. Since there is no genuine dispute as to any material fact and disposition of this case rests upon the proper interpretation of state and federal banking laws, this case appropriately comes before this court on a motion for summary judgment.

The conditions under which a national bank may operate branch offices are contained in the National Bank Act (McFadden Act) 12 U.S.C. § 36.[2] Section 36(c) of that Act permits a national bank to operate a "branch" only when, where, and how state law would authorize a state bank to establish and operate such a branch. First National Bank in Plant City, Fla. v. Dickinson, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); First National Bank of Logan, Utah v. Walker Bank & Trust Co., 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). Virginia banking law permits branch banking in the city, town or county in which the parent bank is located. Also, branch banking is permitted in cities contiguous to the county or city in which the parent bank is located, and in counties contiguous to the city in which the parent bank is located, but where the parent bank is located in a city, such branches may not be established more than five miles outside the city limits. Branch banking elsewhere is accomplished by merger with banks located in any other county, city, or town.[3] Since defendant's parent bank is located in the City of Winchester, Fred-

---

2. The National Bank Act, 12 U.S.C. § 36(c)(1) and (2) as amended provides:

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town, or village in which said association is situated, if such establishment and operation are at the time expressly authorized to state banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

3. Va.Code Ann. as amended § 6.1–39 (1973) provides:

(a) No bank or trust company heretofore or hereafter ·incorporated under the laws of this State shall be authorized to engage in business in more than one place, except that the State Corporation Commission, when satisfied that public convenience and necessity will thereby be served, may authorize banks having paid-up and unimpaired capital and surplus of fifty thousand dollars or over to establish branches within the limits of the city, town or county in which the parent bank is located or to establish branches else-

where by merger with banks located in any other county, city or town.

This section shall not be construed to prohibit· the operation of existing branch banks heretofore established.

The term "parent bank" shall be construed to mean the bank or banking office at which the principal functions of the bank are conducted. The location of a parent bank or of a branch bank may be moved if the State Corporation Commission determines that public convenience and necessity will be served by such move; but the location of a parent bank or of a branch bank may not be moved beyond the limits of the city, town or county in which it is located except through a merger with another bank.

(b) This section shall be construed to allow the merger of banks and the operation. by the merged company of such banks, and to allow the sale of any bank to, and the purchase thereof through merger by, any other bank and the operation of such banks by the merged bank, provided that the State Corporation Commission shall be of the opinion and shall first determine that public convenience and necessity will be served by such operation, and provided further that, at the time of such merger the banks involved shall have been in actual operation for a period of five years or more. But in any case in which the Commission is satisfied that the public interest demands, on account of emergency conditions, that a merger be effected, it may enter an order to such effect permitting such merger notwithstanding that the

erick County, Virginia, defendant's operation of a "branch" in Front Royal, Warren County, Virginia would be unlawful under Virginia banking law and therefore unlawful under federal law. The dispositive issue in this case, then, is whether defendant's drive-in banking facility constitutes a "branch" within the definition of 12 U.S.C. § 36(f). This court finds after careful consideration of all facts and circumstances relevant to this issue that the defendant's operation of the drive-in facility in question does not so constitute a "branch" and is therefore lawful.

12 U.S.C. § 36(f) defines "branch" as follows:

> (f) The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

In *Dickinson, supra,* 396 U.S. at page 135, 90 S.Ct. at page 344, the Court construed this section to mean:

> . . . [T]he term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises;

It is conceded that defendant's drive-in facility, *inter alia,* receives deposits. This court must therefore determine whether the facility shall be deemed "apart from the chartered premises."

A literal and mechanical application of the definition in section 36(f), as construed in *Dickinson, supra* could possibly encompass any free standing structure that performs one of the functions listed in section 36(f). However, it is apparent to this court that the phrase "apart from the chartered premises" was not intended to be inclusive of all structures not physically attached to an existing office. No court, either before or after the Court's decision in *Dickinson,* has ever wielded this definition in so absolute a fashion; rather, courts have considered all relevant factors so as to accord with congressional purpose and common sense. This was the approach followed by the Supreme Court in *Dickinson, supra* as well as other lower federal courts. *See, e. g.,* Jackson v. First National Bank of Valdosta, 246 F.Supp. 134 (M.D.Ga.1965); Dunn v. First National Bank of Cartersville, 345 F.Supp. 853 (N.D.Ga.1972); North Davis Bank v. First National Bank of Layton, 457 F.2d 820 (10th Cir. 1972). This court quotes with approval the words of the court in the unreported case of Michigan National Bank v. Saxon, Civ. No. 821–862 (D.D.C.1962), cited in *Dunn, supra:*

> It [additional office] does not mean, however, that every time a bank rents an additional room or additional offices in another building, as banks do sometimes when their business expands, that they are opening a new branch. The words "additional office" must be reasonably construed as meaning a separate and independent office, operating in the same way as branch banks generally operate, and not merely additional office space to an existing facility.

In deciding this case, this court has been guided by the concerns inherent in the concept of "competitive equality", which lies at the foundation of 12 U.S.C.

---

banks involved, or one or more of them, have not been in actual operation for five or more years.

(c) Notwithstanding the limitations of the foregoing paragraphs, the State Corporation Commission may, when satisfied that public convenience and necessity will thereby be served, authorize the establishment of branch banks in cities contiguous to the county or city in which the parent bank is located, and the establishment of branch banks in counties contiguous to the city in which the parent bank is located. Establishment of such branches may be by merger, consolidation, purchase of assets or creation of a new branch; but if the parent bank is located in a city such branches in the contiguous county may not be established more than five miles outside the city limits.

§ 36(c) and the relevant decisions of the Supreme Court.

■ In *Walker Bank, supra,* a unanimous court, *per* Mr. Justice Clark, articulated the legislative purpose of the McFadden Act as a response to the competitive tensions inherent in a dual system of state and national banking within a state. The court further promulgated the view, later endorsed in *Dickinson, supra,* that neither system, state nor national, shall have advantages over the other in the field of branch banking. This court believes it to be a logical corollary that federal banking law should not be construed in such a fashion as to arbitrarily place a bank at a competitive disadvantage.

■ If a facility illegally functions as a "branch", the intended purpose of the branch cannot vitiate the effect or otherwise justify the operation of that facility. Nevertheless, those facts in the instant case which support the finding that the facility does not function as a "branch" also clearly evidence that the purpose of the contested facility was as an adjunct or annex to the existing branch office. No attempt was made to expand in a material way the geographical region served by the branch office. Consideration was given by defendant to the possibility of expanding the existing office to include a drive-in window; but given the physical location of the office, such construction was not feasible. Plaintiff concedes that had construction been feasible, either in the municipal parking lot immediately behind the branch office or in the lot adjacent to the building, no objection would have been asserted.

Viewed in the light of these facts and present Virginia branch banking law, the question reduces to whether a bank shall be placed at a possibly permanent competitive disadvantage in meeting the needs, preferences, and modern banking habits of its customers because of its physical location, established in most instances long before such needs are apparent. This court believes that the answer must be a qualified no.

■ In *Dickinson, supra,* on which plaintiff heavily relies, the court considered the case of an armored car mobile service center. That facility clearly fell within the language as well as the spirit of 12 U.S.C. § 36(f). As the Court recognized, that case involved a clear, systematic attempt to secure branch banking privileges prohibited under state law. *Id.,* 396 U.S. at 138, 90 S.Ct. 337. Such is not the situation in this case. Defendant erected its facility as close to its existing bank as conditions permitted. Such drive-in facilities are permitted under state law, and had defendant been benefited by the fortuity of having located where a drive-in window could have been physically attached to the existing office, the operation of such a facility would not have been challenged. This court cannot, therefore embrace the arbitrary position that a bank's inability to attach physically a drive-in facility to an existing office must automatically and mechanically qualify any free-standing structure as a "branch". To do so would be so arbitrary as to undercut the very concept of "competitive equality". The nature of our analysis must then focus on at what point a free-standing facility is so situated relative to an existing bank office that it can reasonably be said to function as a qualitatively distinct and separate service facility "apart from the chartered premises". In order to determine when a facility is so far detached from an existing office as to constitute a separate "branch", we must identify those operative concerns basic to the federal statute and the court's decision in *Dickinson, supra.* This court discerns in the Act and the relevant Supreme Court decisions two basic factors, central to the consideration of whether a facility constitutes a "branch":

(1) whether a facility expands in a material way customer access to banking service in a geographical area not previously served;

(2) whether the facility is so situated physically as to give a bank a material competitive advantage in securing customers.

██ In order to determine the presence or absence of these two often unarticulated factors, courts have considered certain data relevant. These have included (1) the distance separating the facility from the existing bank office, (2) the number of intervening structures, (3) the lack of physical connection, such as by pneumatic tubes, between the facility and the existing bank office, and (4) the economic effect of the facility on the balance of competition between competing banks. *See, e. g.,* Jackson v. First National Bank of Valdosta, *supra;* Dunn v. First National Bank of Cartersville, *supra;* North Davis Bank v. First National Bank of Layton, *supra.* Other factors this court has considered relevant to this case are (1) whether it was feasible for an existing bank office to physically attach the drive-in windows to the existing office, and (2) whether the freestanding facility could have been constructed closer to the existing bank office. In making these determinations, no single factor impresses this court as controlling; nor do any hard and fast rules concerning such factors as distance of separation recommend themselves. Only after considering all the relevant factors and circumstances peculiar to this case has this court determined that the defendant's drive-in facility does not constitute a "branch".

The facts of the cases cited in support of plaintiff's position are clearly distinguishable from the case at bar.

Plaintiff urges this court to adopt as dispositive of this case the Supreme Court's decision in *Dickinson, supra.* In *Dickinson,* a national bank attempted to provide its customers with the services of an armored mobile service center and an off-premises receptacle for deposits. The armored car serviced individual customers at their place of business. Flori-da banking proscribed all branch banking. The court found that the armored car and deposit receptacle impaired the "competitive equality" of state and national banks by serving customers in areas other than those served by the main office. In the instant case, this court finds that the drive-in facility does not materially increase the region of customer service so as to impair the existing competitive balance. A bank customer must still drive to approximately the same area now served by the existing branch. Only customer convenience is affected.

Plaintiff further cites Jackson v. First National Bank of Valdosta, *supra* for the proposition that the concept of "unity of operation" is not applicable to a physically separate facility with respect to an existing office. *Jackson, supra* involved a drive-in facility approximately 300 feet away from an existing office and further separated by an alley and ten intervening buildings containing unrelated businesses. Considering the factors listed in this opinion as relevant, the district court found that the facility constituted a "branch" and that the concept of "unity of operation" was not supported by the facts of that case.

Other courts have, however, recognized the validity of that concept in appropriate cases. *See Dunn, supra; North Davis, supra.* Dunn, *supra* involved an installment loan building 40 feet from the main building and separated by an intervening street. After concluding that the loan building did not threaten the existing competitive balance within the local banking community, the court held the loan building not to be a "branch" but only an integrated extension of an existing office. The Court of Appeals in *North Davis, supra* likewise held that a drive-in facility, similar to defendant's, erected across the street from an existing office was not a "branch". In so holding, the court adopted the language of the Utah Supreme Court in First National Bank of

Logan v. Walker Bank & Trust Co., 19 Utah 2d 18, 425 P.2d 414 (1967) that the facts of the case "portrays a single, integrated banking operation at a banking house, expanded in the manner described to accommodate customers coming to that same banking house." 457 F.2d at 824.

Plaintiff lastly refers this court to past rulings of the Virginia State Corporation Commission (SCC) that certain facilities similar to the contested facility are "branches". Because each facility must be judged on the facts and circumstances peculiar to that facility, this court feels that the previous rulings of the SCC are not necessarily inconsistent with the court's disposition of this case. This court in passing only ventures the view that the rulings in those cases may have been affected by the location of the proposed facilities in shopping centers, thus increasing to a significant degree access to customers. In any event, though this court has given those rulings due consideration, the decisions of the Commission are not binding precedent. While branch banking by national banks is subject to the restrictions of State law, what constitutes a "branch" is a threshold question controlled by federal law. *Dickinson, supra*, 396 U.S. at 133–134, 90 S.Ct. 337, 343, 24 L.Ed.2d 312. As the court stated in *Dickinson, supra*:

> Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated, *Walker Bank, supra,* for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable re-

sult, as appears from the inclusion in § 36 of a general definition of "branch."

In reaching this decision, the court has considered the fact that the drive-in facility has hours different from those of the existing branch, and that the facility and the branch are not connected by pneumatic tubes. Though these two factors may weigh in favor of labelling this facility a "branch", given all the circumstances of this case, these factors alone do not justify such a result. This is particularly true when one considers that a drive-in facility physically attached may also have hours different from the rest of the office.

■ The court is well aware of the problems inherent in its refusal to adopt the simple expedient of labelling all free-standing structures as separate "branches". This court is comforted, however, in its knowledge that a case by case consideration will do greater justice and better comport with legislative intent and judicial sense. Though this court has engaged in an independent consideration of all factors relating to this case and has made an independent judgment based on its findings, this court is further supported in its decision by the well established principle that the Comptroller's determination will be upheld in the absence of arbitrary and capricious conduct. *Dunn, supra; cf.* Sterling National Bank of Davie v. Camp, 431 F.2d 514 (5th Cir. 1970).

This court based on its above opinion hereby grants defendant's motion for summary judgment and dismisses this case with prejudice and it is so ordered.

The clerk is directed to send a certified copy of this opinion and order to counsel of record.