**NEBRASKANS FOR INDEPENDENT BANKING, INC., et al., Appellants,**

**v.**

**The OMAHA NATIONAL BANK, a National Banking Association, Appellee.**

**No. 75–1109.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 12, 1975.

Decided Feb. 3, 1976.

Certiorari Granted June 7, 1976.
See 96 S.Ct. 2616.

Lay, Circuit Judge, filed a concurring opinion.

Webster, Circuit Judge, joined by Henley, Circuit Judge, filed a dissenting opinion.

---

**756**

Marvin G. Schmid, Omaha, Neb., for appellants.

Virgil J. Haggart, Jr., Omaha, Neb., for appellee.

Before GIBSON, Chief Judge, and LAY, HEANEY, BRIGHT, ROSS, STEPHENSON, WEBSTER and HENLEY, Circuit Judges, en banc.

GIBSON, Chief Judge.

The plaintiffs-appellants, a group of national and state banks and a trade organization formed to foster independent banking, seek a declaratory judgment and injunctive relief [1] against the defendant-appellee, The Omaha National

1. This action initially was filed in the state court and was removed by The Omaha National Bank to the United States District Court.

Bank in Omaha, Nebraska. The plaintiffs claim that Omaha National is maintaining and operating three branch banking facilities, rather than two such facilities, in violation of state and federal law.

A divided panel of this court, in an opinion filed August 5, 1975, affirmed the decision of the United States District Court holding that one of the facilities challenged was only an extension of the main bank, not a branch, thus dismissing plaintiffs' complaint. A petition for rehearing en banc was granted, which action vacated the panel opinion.

After full consideration by the court en banc, the judgment of the District Court is reversed and remanded with directions to enter a judgment finding that Omaha National Bank is violating applicable federal law by operating three detached banking facilities and ordering that one of these facilities be eliminated.

Under Nebraska law, subject to geographic limits, state-chartered banks are permitted to maintain one "attached" and two "detached auxiliary teller offices." Neb.Rev.Stat. § 8–157 (Supp. 1974). The McFadden Act, 12 U.S.C. § 36 (1970), incorporates state law setting forth limits upon a national bank's maintenance and use of branch facilities.[2]

Omaha National's main bank is located in the 30-story, multi-tenant Woodmen Tower Building in downtown Omaha, occupying the south half of the block bounded by 17th Street on the east, 18th Street on the west, Douglas Street on the north, and Farnam Street on the south. (See Fig. 1.) Omaha National also operates two outlying banking facilities acknowledged by all parties to be branches under federal law and certified as such by the Comptroller of the Currency pursuant to 12 U.S.C. § 36. One branch is located at 108th and "M" Streets and the other at 42nd and Grover Streets, both within the city limits of Omaha.

2. Section 36 in pertinent part reads as follows:

§ 36. *Branch banks.*

The conditions upon which a national banking association may retain or establish and operate a branch or branches are the following:

\* \* \* \* \* \*

(c) A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks.

Relative location of ONB main bank
and 18th & Douglas facility.

FIG. 1.

The focal point of this lawsuit is Omaha National's operation of another walk-up/drive-in facility located on leased realty at the southwest corner of 18th and Douglas Streets, directly to the west of the northern half of the block upon which the Woodmen Tower is situated. The plaintiffs contend this facility is also a branch which, when coupled with the other two admitted branch facilities, constitutes an operation by Omaha National of three branch banking facilities in violation of the applicable statutes. Omaha National, on the other hand, contends the 18th and Douglas facility is merely an extension of its main bank operation, not a branch.

The 18th and Douglas facility is a detached office facility with ten drive-in and six walk-in teller stations. It is a custom-built, free-standing building unattached to the main bank. There is a pneumatic tube connection between the two buildings used by the bank to transport currency and papers. The facility is separately staffed, has a separate tele-phone listing, offers most of the customary banking services, accepts deposits, cashes checks, makes non-commercial loans and maintains somewhat longer public hours than does the main bank. It does not offer safe deposit boxes, trust services or, according to its brief, international banking or commercial loans. Its net deposits are transported to the main bank by armored car.

Approximately ten weeks after Omaha National began constructing the new facility, plaintiffs obtained a state court order restraining Omaha National from operating it as a detached auxiliary teller office. After removal to the federal court pursuant to 28 U.S.C. § 1441 (1970), the District Court dissolved the state restraining order and stayed proceedings, directing Omaha National to ask the Comptroller of the Currency to reconsider the Regional Administrator's prior ex parte ruling, obtained by Omaha National before construction, that the planned facility would not constitute a branch requiring federal certification.

The Comptroller, after reconsidering additional submissions by both parties, again concluded that an adversary administrative hearing would be unwarranted and reaffirmed the earlier determination that the Omaha National facility is not a branch under federal law.

■■■ Under 12 U.S.C. § 36(c) a national banking association may engage in branch banking only when, where and how state law would expressly authorize a state bank to do so. *First National Bank v. Walker Bank & Trust Co.,* 385 U.S. 252, 260–62, 87 S.Ct. 492, 17 L.Ed.2d 343 (1966). It is established that what constitutes a "branch" is a question of federal law, not controlled by state law definitions, *First National Bank v. Dickinson,* 396 U.S. 122, 133, 90 S.Ct. 337, 24 L.Ed.2d 693 (1969); *Driscoll v. Northwestern National Bank,* 484 F.2d 173, 175 (8th Cir. 1973), but the determination must be made on the facts of each case, not according to a fixed test. *North Davis Bank v. First National Bank,* 457 F.2d 820, 824 (10th Cir. 1972). The definition of "branch," governing national banks, contained in § 36(f), includes:

> [A]ny branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

The Supreme Court has recognized that this circular definition "may not be a model of precision" and has added substance to it by observing that:

> [T]he term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises[.] (Emphasis in original.)

*First National Bank v. Dickinson, supra,* 396 U.S. at 135, 90 S.Ct. at 344.

As this definition is phrased in the disjunctive, the offering of any of the three listed services at a location "apart from the chartered premises" will provide a basis for finding that branch banking is taking place. Considered in light of this definition, the 18th and Douglas facility is definitely a branch unless it can be characterized as being "attached" to, rather than "apart from," the main bank.

■■■ The Supreme Court has held that in applying the statutory definition of "branch," equal recognition must be extended to the policy of maintaining "competitive equality" between the state and national banking systems insofar as branch banking is concerned. The preservation of competitive equality is the pervasive underlying principle of the McFadden Act. *First National Bank v. Walker Bank & Trust Co., supra,* 385 U.S. at 261, 87 S.Ct. 492. In this light, Chief Justice Burger has observed for the Court that:

> [W]hile Congress has absolute authority over national banks, the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks. Congress has deliberately settled upon a policy intended to foster "competitive equality." * * * State law has been utilized by Congress to provide certain guidelines to implement its legislative policy.
>
> * * * * * * *
>
> The mechanism of referring to state law is simply one designed to implement that congressional intent and build into the federal statute a self-executing provision to accommodate to changes in state regulation.
>
> * * * * * * *
>
> In short, the definition of "branch" in § 36(f) must not be given a restrictive meaning which would frustrate the congressional intent this Court found to be plain in *Walker Bank, supra.* (Citations and footnote omitted.)

*First National Bank v. Dickinson, supra* at 131, 133, 134, 90 S.Ct. at 342.

■■■ The central issue in this case is whether Omaha National's 18th and Douglas facility has properly been characterized as an extension of the main bank and not a branch bank "apart from the chartered premises." To be sure, the Supreme Court's use of the phrase

"apart from the chartered premises" was not intended to classify every free-standing facility as a branch. *Virginia ex rel. State Corporation Commission v. Farmers & Merchants Bank,* 380 F.Supp. 568, 572 (W.D.Va.1974), aff'd per curiam, 515 F.2d 154 (4th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 133, 46 L.Ed.2d 99 (1975). However, lack of physical connection to the main bank is obviously a necessary though not sufficient characteristic shared by all facilities "apart from the chartered premises."

◼ If the instant facility is "apart from the chartered premises" so as to be a branch embraced by the rule of *First National Bank v. Dickinson, supra,* then Omaha National is engaging in branch banking in a manner exceeding that permitted Nebraska state banks. Each Nebraska bank, subject to geographic limits, is permitted to maintain only one "attached auxiliary teller office" and two "detached auxiliary teller offices." Neb.Rev.Stat. § 8–157.[3] Regulations promulgated by the Nebraska Department of Banking define attached and detached auxiliary teller offices as follows:

(a) A *detached* auxiliary teller office contemplates the establishment of another banking facility which is physically removed and located in another area away from the main banking house and which is separated from the main banking house in such a way so as to not constitute a contiguous unit operation.

(b) An *attached* auxiliary teller office contemplates a physical connection, a constructed attachment whereby there exists a single, integrated

banking operation at the main banking house, expanded to accommodate customers coming to the main banking house. *Connecting a main banking house to a detached facility by means of a system of pneumatic tubes and/or closed circuit television does not convert the detached facility into an attached facility.* (Emphasis added.)

Nebraska Department of Banking Reg. § 8–157–01 (1970).

◼ The language of § 36(c) makes clear that Congress intended to allow state law to determine whether branch banking by a national bank in a given state will be permitted and, if so, the limits on branch units. While the language is somewhat ambiguous concerning the extent to which state law should be used to *define* branch banking, the Supreme Court's recognition of Congress' paramount policy of fostering competitive equality in the McFadden Act mandates that, in determining whether a national bank facility is a branch, prime consideration must be given to whether a state bank would be allowed to maintain one like it in the circumstances. If the state branch would be prohibited, the facts calling for classification of the national bank facility as a mere "extension of the main bank," and not a branch, must be obvious and compelling to avoid what the Supreme Court condemned as restrictively applying the definition of "branch" in a manner frustrating congressional intent. *First National Bank v. Dickinson, supra,* 396 U.S. at 134, 90 S.Ct. 337.

◼ The cases considering the factual question whether a given national

---

**3.** The statute, Neb.Rev.Stat. § 8–157 (Supp. 1974), provides in part:

(1) No bank shall maintain any branch bank and, except as provided in subsection (2) of this section, the general business of every bank shall be transacted at the place of business specified in its charter.

(2) With the approval of the director, (a) any bank may maintain an attached auxiliary teller office, and (b) any bank may establish and maintain not more than two detached auxiliary teller offices, to be used as motor vehicle and walkup off-street banking facilities, such offices to be within the corporate limits of the city in which such bank is

located. Any bank that establishes and maintains two auxiliary teller offices shall locate one of such offices within three miles of the premises specified as its place of business in its charter. Neither shall be located within three hundred feet of another nonparticipating bank or within fifty feet of another auxiliary teller office. *The services of such auxiliary teller offices whether attached or detached from the bank shall be limited to receiving deposits of every kind and nature, cashing checks or orders to pay, issuing exchange, and receiving payments payable at the bank.* (Emphasis added.)

bank facility is a "branch" have identified a number of factors to be assessed in making the determination.[4] They include (1) the distance separating the main bank from the added facility; (2) the presence or absence of intervening structures; (3) the physical connection, if any, between the main bank and the facility; (4) the effect upon the balance of competition (that is, whether the facility expands in a material way customer access to banking services in a location not previously served so as to give a material competitive advantage in securing customers); (5) the availability of other locations for attached expansion; and finally (6) the dependence of the facility upon the main bank in day-to-day banking operations. The Comptroller in the instant case recited a number of these factors in his final opinion concluding Omaha National's facility is not a branch and the District Court framed its analysis in the same manner.[5]

We have no quarrel with the use of such factors as an aid to the factfinder in analyzing the circumstances of a particular case, provided they do not overshadow application of the statutory definition of "branch" and the principle of competitive equality. However, in the instant case Omaha National, the Comptroller and the District Court have lost sight of the Supreme Court's definition of "branch bank" in *First National Bank v. Dickinson, supra* 396 U.S. at 135, 90 S.Ct. 337, and disregarded the indispensable role state law must play in applying

---

**4.** The cases are collected and discussed in *Virginia ex rel. State Corp. Comm. v. Farmers & Merchants Nat'l Bank,* 380 F.Supp. 568, 572–74 (W.D.Va.1974), *aff'd per curiam,* 515 F.2d 154 (4th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 133, 46 L.Ed.2d 99 (1975).

There, a detached drive-in facility located 200 feet and across the street from a branch office in a county adjoining that of the main bank, without even a pneumatic tube connection to the existing branch, was held not to be an additional "branch" under § 36(f). The federal district court in Virginia was cautious to note that similar drive-in facilities, if physically attached to existing branches, were permitted by applicable state law and implied that state law would permit a state bank to do what the national bank was attempting to do. 380 F.Supp. at 573. Such is not the case here. Whereas in *Farmers & Merchants* the district court only *assumed* that state law definitions of "branch" were flexible enough to accommodate the unattached drive-in expansion as part of a state bank's existing branch (despite prior state administrative rulings apparently to the contrary), in the instant case it is *clear* that Nebraska law would not permit a state bank to do what Omaha National is attempting.

However, even without the apparently distinguishing fact that Virginia state law might permit the expansion, in our view the *Farmers & Merchants* decision impermissibly subordinated § 36(f)'s statutory definition of "branch" and underrated the influence of state law definitions of branching in favor of administrative fiat and judicially conceived criteria recited in the cases. To the extent the *Farmers & Merchants* court did so, we decline to follow it.

**5.** The District Court noted that "[t]hough this explicitly is not an appeal from [the Comptroller's June 26, 1974] decision, the Court is in agreement with that adjudication." The Comptroller explained his criteria for decision as follows:

[W]hether a particular structure to be constructed by a national bank in close proximity to an existing main office or branch is a separate "branch office" or simply an integral part of the existing structure, is an issue of Federal law which must be resolved in the first instance by this Office. 12 U.S.C. §§ 36(c) and (f). Resolution of this issue on any particular set of circumstances requires application of a number of basically factual criteria which have been administratively and judicially developed over a number of years. Among the factors considered are distance from the existing site of the proposed site, intervening structures, physical connection, alternate choices, if any, for expansion of existing facilities, and impact of the proposed structure upon the balance of competition within the banking community. If, from an examination of all pertinent factors, no single one of which is controlling, it appears that the proposed structure will be so closely tied to an existing office as to be an integral part thereof and thus constitute a single banking operation, the Comptroller's Office must conclude that such a proposed addition is merely an extension of the existing bank premises and not a branch separate and apart therefrom.

As this is not an appeal from the Comptroller's ruling, we are not bound by the narrow "arbitrary and capricious" standard of review. *Cf. Sterling National Bank v. Camp,* 431 F.2d 514, 516 (5th Cir. 1970), *cert. denied,* 401 U.S. 925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971); *Dunn v. First National Bank,* 345 F.Supp. 853, 857 (N.D.Ga.1972). *See also Mid-West Nat'l Bank v. Comptroller,* 296 F.Supp. 1223, 1226 (N.D. Ill.1968).

the federal definition of "branch" in order to maintain competitive equality. By force of the language of § 36(c) itself, the fact that a state bank would not be permitted to operate the challenged facility in addition to its other existing facilities, must take precedence as a decision criterion over the many administratively and judicially conceived factors discussed above. *See First National Bank v. Dickinson, supra; First National Bank v. Walker Bank & Trust Co., supra; Driscoll v. Northwestern National Bank, supra.*

The District Court gave what it termed "special consideration" to Nebraska banking regulation § 8–157–01(b), defining "attached auxiliary teller" offices. However, the court concluded that the integration of operation existing between Omaha National's main bank and the facility, accommodating customers coming to the main bank, presents a unique circumstance "not contemplated by the regulation." While this court ordinarily gives deference to a district court's interpretation of state law, *Luke v. American Family Mutual Insurance Co.,* 476 F.2d 1015, 1019 & n.6 (8th Cir.), *cert. denied,* 414 U.S. 856, 94 S.Ct. 158, 38 L.Ed.2d 105 (1973); *Indemnity Insurance Co. v. Pioneer Valley Savings Bank,* 343 F.2d 634, 644–45 (8th Cir. 1965), no such deference need be given if, as here, the court refuses to invoke state law where applicable. The District Court did not conclude whether in its view a state bank would be permitted to operate similar facilities in the same circumstances as Omaha National's; but our reading of the Nebraska statute and regulations make it abundantly clear that a state bank would not be permitted to do so, and that the instant facility, on the facts the District Court found to exist, is a "branch" under federal law.

After construction of the new facility was challenged, Omaha National contacted Henry E. Ley, the Nebraska Director of Banking, and solicited an opinion from him as to the legality of the challenged facility under state law. Although the Director had informally, prior to the construction, given an opinion that the facility as explained to him would be merely "a continuation of the operation of Omaha National Bank in its main office," the Director, upon further investigation, later determined that the facility could "in no way be considered attached to that part of the [Woodmen Tower] building housing the Omaha National Bank." In his deposition admitted in evidence at trial, Director Ley acknowledged his change of opinion, the reason therefor, and again concluded that the facility is not "attached." He further testified that he "would not allow a state bank to operate these three facilities as they are set up at the present time."

While the state director's view is not dispositive, it is certainly illuminating on the extent to which a state bank could extend its operation under Nebraska law; and the same result should ensue with a national bank if full credit and meaning is to be given to the doctrine of competitive equality legislated in § 36. It definitely appears that Omaha National has extended its operation beyond permissible bounds. The District Court's finding that the 18th and Douglas facility is an integral extension of the main bank and not a branch bank must be set aside as clearly erroneous factually and as induced by an erroneous view of the law defining a branch bank. *Lewis v. Super Valu Stores, Inc.,* 364 F.2d 555, 556 (8th Cir. 1966); *Cleo Syrup Corp. v. Coca-Cola Co.,* 139 F.2d 416, 418 (8th Cir. 1943), *cert. denied,* 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944).

The ultimate issue in the instant case is not simply a factual one. It involves application of the federal law defining branch banking. Only by overlooking the definition of "branch" contained in § 36(f), construed by the Supreme Court in *First National Bank v. Dickinson, supra* 396 U.S. at 135, 90 S.Ct. 337, and by wholly ignoring Nebraska's branch banking proscription made directly relevant by the policy of competitive equality embodied in § 36(c), could it be concluded that the 18th and Douglas facility is not a branch. The question in this case is not whether Omaha National acted reasonably or prudently in a business sense in moving the service of its previous at-

tached Brandeis drive-in facility to 18th and Douglas or whether doing so in lieu of other alternatives was least unsettling to the balance of competition,[6] but simply whether the facility constitutes a federally defined "branch" carrying Omaha National beyond the limits of branching permitted state banks.

The term "branch bank" at the very least includes any place for receiving deposits or paying checks or lending money apart from the chartered premises. *First National Bank v. Dickinson, supra* 396 U.S. at 135, 90 S.Ct. 337. It is undisputed that deposits are received and checks paid at the 18th and Douglas facility, and Omaha National concedes that loan applications are accepted there as well.[7] Further, it cannot be seriously disputed that a free-standing facility located around the corner, one block up and across the street from the main bank's south entrance on Farnam Street, even if connected by a pneumatic tube, is one located "apart from the chartered premises" as a matter of law. The bank's main entrance is yet further from the facility, around two corners on 17th

Street to the east. There is no west entrance directly into the main bank from 18th Street for the reason that the bank on the ground floor is located only in the east half of the Woodmen Tower lobby.

Thus, the characterization of the 18th and Douglas facility as "an integrated extension of the main bank," without reference to the Supreme Court's construction of the term "branch bank" under § 36(f) or regard for the state's characterization of such a facility as "detached," was induced by an erroneous view of the law and must be set aside.

In view of our disposition of the plaintiffs' substantive claim, we do not rule on their procedural claims that the court erred in limiting the scope of discovery and in excluding and receiving various matters in evidence.

The judgment of the District Court is reversed and the case remanded for entry of a judgment that Omaha National is operating three branch banks within the meaning of 12 U.S.C. § 36 and providing appropriate injunctive relief consistent with this opinion.

---

**6.** In the summer of 1973, when Omaha National applied to the Comptroller of the Currency for authority to construct the new facility at 18th and Douglas Streets, it was operating two downtown banking offices in addition to its main banking house. One was an attached drive-in facility located in the adjoining Brandeis Parking Garage; the second was a detached drive-in/walk-up office located in the free-standing "cupcake" shaped building located at 19th and Dodge Streets, three blocks northwest of the main bank. However, by January, 1974, Omaha National had closed its two downtown facilities and replaced them with the 18th and Douglas facility, which was approximately halfway between the two. Two outlying branches at 42nd and Grover and 108th and "M" Streets were also established, only one of which is permissible under the two branch limitation.

This establishment of an additional outlying branch had a substantial impact on the balance of banking competition. Though the Comptroller concluded that "whatever changes have taken place in the banking community in Omaha, as a result of the establishment of ONB's new [facility] at Douglas and 18th Streets, [were] * * * exceptionally minor," the Comptroller's scope of inquiry on that issue appears to have been unjustifiably restricted to the downtown Omaha banking community. Irrefragably, the introduction of a new branch in an outlying area within the city limits had a significant impact on the balance of banking competition.

Thus, in effect, Omaha National has combined the operation of *two* previous downtown facilities (one detached and one attached) into a *single* (detached) downtown branch at 18th and Douglas Streets. By contending that this new detached downtown office is no more than an extension of the main bank premises, Omaha National is attempting to fit its three branch (four location) operation into the state's two branch limitation. Avoidance of the state's branching limitation by a national bank in this manner, however, conflicts directly with the doctrine of competitive equality and should not be permitted.

**7.** The argument that this facility has no safe deposit boxes, trust department or international banking operation is, to say the least, irrelevant. State banks could not offer such services at auxiliary teller offices under present Nebraska law. As noted, Neb.Rev.Stat. § 8–157 limits the services offerable in attached or detached state bank auxiliary teller offices "to receiving deposits of every kind and nature, cashing checks or orders to pay, issuing exchange, and receiving payments * * *."

LAY, Circuit Judge (concurring).

I concur in the result. However, I cannot accept the rationale offered by the majority. The opinion in my judgment misconstrues the deference due state law under the policy of competitive equality and thereby justifies use of state law to define a federal branch bank. This allows "the tail to wag the dog." The definition of a "branch" bank is solely a question of federal law. *First National Bank v. Dickinson*, 396 U.S. 122, 134–36, 90 S.Ct. 337, 24 L.Ed.2d 693 (1969); *Driscoll v. Northwestern National Bank*, 484 F.2d 173, 175 (8th Cir. 1973).

The McFadden Act, 12 U.S.C. § 36, sets out the concept of competitive equality:

A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, *if such establishment and operation are at the time expressly authorized to State banks by the law of the State in question;* and (2) at any point within the State in which said association is situated, *if such establishment and operation are at the time authorized to State banks by the statute law of the State in question by language specifically granting such authority affirmatively* and not merely by implication or recognition, and *subject to the restrictions as to location imposed by the law of the State on State banks.* 12 U.S.C. § 36(c) (my emphasis).

As the Supreme Court discussed in *Dickinson* :

[W]hile Congress has absolute authority over national banks, the federal statute has incorporated by reference the limitations which state law places on branch banking activities by state banks. Congress has deliberately settled upon a policy intended to foster "competitive equality." *Walker Bank,* 385 U.S., at 261, 87 S.Ct. [492], at 497, 17 L.Ed.2d 343. State law has been utilized by Congress to provide certain

guidelines to implement its legislative policy.

. . . . .

Admittedly, state law comes into play in deciding *how, where, and when* branch banks may be operated, *Walker Bank, supra,* for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. 396 U.S. at 131, 133, 90 S.Ct. at 342 (my emphasis).

Although state law comes into play in deciding "how, where and when" a branch may operate, Congress intended federal law to determine "what" is a branch. With this in mind I fail to see the relevance of the testimony of the State Banking Director or of state law in deciding whether or not the drive-in facility is a branch. Section 36(f) simply says:

The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent. 12 U.S.C. § 36(f).

The evidence is undisputed that at the facility in question "deposits are received" and "checks paid." The only remaining issue under the test of *Dickinson* is whether the bank is "apart from the chartered premises." *Dickinson, supra* 396 U.S. at 135, 90 S.Ct. 337. The physical facts clearly support the finding that the drive-in facility is "apart from the chartered premises." Reference to state law merely serves to corroborate this determination. Under Nebraska Department of Banking Regulations, § 85–157–01, the facility is considered "detached." However, regardless of this regulation, the facility is clearly a "branch bank" under federal law.

WEBSTER, Circuit Judge, joined by HENLEY, Circuit Judge, dissenting.

I respectfully dissent. This case was in my view correctly decided in the original panel opinion, authored by Judge

Devitt,[1] which affirmed the District Court's findings under the clearly erroneous standard of review. Our holding today undercuts *First National Bank v. Dickinson*, 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 693 (1969), by assigning to state law an "indispensable role" in the determination of what is a "branch" of a national bank. Majority Opinion at 11–12. Judge Lay, in his separate concurring opinion, shares my view that the definition of a branch bank is solely a question of federal law and that state law is irrelevant to this issue. I cannot agree with him, however, that the Omaha National Bank facility is "clearly a 'branch bank' under federal law" or that the District Court's holding to the contrary was clearly erroneous.

If, as the majority opinion seems to imply,[2] the existence of a state statute or regulation limiting or prohibiting certain types of activities may operate to pre-empt the determination by a federal court of whether a specific facility is or is not a branch, then the established rule that branch banks are defined under federal law is mere lip service. I cannot accept such a circular result.

The federal definition of branch banks, set forth in 12 U.S.C. § 36(f), provides:

> The term "branch" as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business located in any State or Territory of the United States or in the District of Columbia at which deposits are received, or checks paid, or money lent.

The Supreme Court elaborated upon this definition in *First National Bank v. Dickinson, supra,* 396 U.S. at 135, 90 S.Ct. at 344, where it said:

> [T]he term "branch bank" at the very least includes *any* place for receiving deposits or paying checks or lending

money apart from the chartered premises * * *. (emphasis original)

The Supreme Court has made it abundantly clear that while a state may limit or prohibit branch banking within its borders it has no role to play in determining what is or is not a "branch" of a national bank:

> We reject the contention made by *amicus curiae* National Association of Supervisors of State Banks to the effect that state law definitions of what constitutes "branch banking" must control the content of the federal definition of § 36(f). Admittedly, state law comes into play in deciding how, where, and when branch banks may be operated * * * for in § 36(c) Congress entrusted to the States the regulation of branching as Congress then conceived it. But to allow the States to define the content of the term "branch" would make them the sole judges of their own powers. Congress did not intend such an improbable result, as appears from the inclusion in § 36 of a general definition of "branch." (citation and footnote omitted)

*First National Bank v. Dickinson, supra,* 396 U.S. at 133–34, 90 S.Ct. at 343.

Once a facility of a national bank has been determined to be a "branch" under federal law, then state law may govern the "how, where, and when" of its operation. That is the extent of competitive equality. When Congress undertook to include a general definition of "branch" in the McFadden Act, it could hardly have intended that the definition should have one meaning in Nebraska and another meaning in Virginia. State law is, therefore, irrelevant in the determination of what is or is not a "branch" of a national bank.[3]

The issue before this Court is whether the District Court was clearly erroneous in determining that the facility was not

---

1. The Honorable Edward J. Devitt, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

2. The majority opinion assigns state law an "indispensable role" in this process. *See* Majority Opinion at 761–762.

3. Judge Lay, while acknowledging that federal law controls the definition, would permit reference to the Nebraska law to "corroborate" such determination. This suggests an indirect influence which I think is impermissible.

a branch bank. *See* Fed.R.Civ.P. 52(a). A number of factors have been recognized as being relevant to the issue of whether a facility is a branch. *See* Majority Opinion at 760–761. These include:

> (1) the distance separating the main bank from the added facility; (2) the presence or absence of intervening structures; (3) the physical connection, if any, between the main bank and the facility; (4) the effect upon the balance of competition (that is, whether the facility expands in a material way customer access to banking services in a location not previously served so as to give a material competitive advantage in securing customers); (5) the availability of other locations for attached expansion; and finally (6) the dependence of the facility upon the main bank in day-to-day banking operations.

*Id.* *See also Virginia ex rel. State Corporation Commission v. Farmers and Merchants National Bank,* 380 F.Supp. 568, 572–74 (W.D.Va.1974), *aff'd per curiam,* 515 F.2d 154 (4th Cir.), *cert. denied,* 423 U.S. 869, 96 S.Ct. 133, 46 L.Ed.2d 99 (1975).

Because the evidence is undisputed that deposits are received and checks are paid at the facility in question, the key issue under *Dickinson* is whether the facility is "apart from the chartered premises". In *Virginia ex rel. State Corporation Commission v. Farmers and Merchants National Bank, supra,* the district court applied these various factors in determining whether the questioned facility, which was 200 feet from an existing bank, was "apart from the chartered premises". After carefully evaluating the unavailability of feasible alternatives which would have been closer to the main bank and the fact that the new facility did not materially increase the region of customer service so as to impair the existing competitive balance, the court concluded that the facility was not "apart from the chartered premises" and was thus not a branch bank under the federal definition of that term.

In this case, the factors considered by the District Court included (1) the distance between the main bank and the challenged facility; (2) the regular utilization of a pneumatic tube system between the two facilities; (3) the unavailability of feasible alternate sites for an attached auxiliary teller office; (4) the high degree of integration of the operations of the main bank and the facility; (5) the absence of intervening physical structures; and (6) the absence of an effect upon the balance of competition.[4]

---

4. In evaluating these factors, the District Court said:

> Even though the distance between the bank's facilities in the Woodmen Tower and the 18th & Douglas facility, including the width of 18th Street, which is a moderately traveled truncated street, is 102 feet (measured in a straight line diagonally from the northwest corner of the Woodmen Tower Building to the southeast corner of the property upon which the walk-in/drive-in facility is located), the integration of operation between the main bank and this auxiliary teller office under the geographical restrictions exhibited in this case, coincident with the regular utilization of the functional underground pneumatic tube system, warrants this Court in finding that the facility in issue is physically and operationally attached. * * * The positioning of a night depository on the main floor of the Woodmen Tower at a substantial distance to the west of the main bank's premises for customer service and the utilization of several entire floors above the main floor of the Woodmen Tower Building, which abuts 18th Street on the west, exhibits the pervading presence of the operations of the Omaha National Bank on the southern half of the block contiguous to Farnam Street from 17th to 18th Streets.
>
> \* \* \* \* \* \*
>
> This Court has scrutinized the move of the Omaha National Bank from its prior attached facility immediately to the north of its main bank premises at 17th & Farnam. The reasons for the move are reasonable and compelling. The severe traffic congestion that prevailed at the entrance and exits of this facility several hours a day demanded either a structural change or a move. (A material factor contributing to this congestion was the uncontemplated alteration of the direction of the one-way traffic on 17th Street from northbound to southbound subsequent to the erection of this edifice.) Since this facility was entrenched within the ground floor of approximately an eight story parking lot, the options for structural modification when considering the magnitude of the building's pillars within the ground floor

After considering "all of the relevant factors and circumstances peculiar to this case", including the Comptroller's investigation and ruling, the court concluded that the Omaha National Bank facility was not a branch bank.

Competitive equality does not mean that there will not be some differences from time to time between what is or is not a "branch" as determined under federal law and what a particular state considers a branch to be. Such differences are inevitable in a federal system. The federal standards were applied in this case and the facility was determined not to be a branch. There was substantial evidence to support the District Court's finding that "[t]he 18th & Douglas facility did not expand in a material way customer access in a geographical area not previously served," and that the facility was not so situated physically "as to give the Omaha National Bank a material competitive advantage in securing customers." The ultimate finding that the facility was "an integrated extension of the main bank" and not a branch under federal law was not clearly erroneous.

and at the outlets of ingress and egress were neither physically nor financially feasible. The carbon monoxide buildup from the stacked automobiles on the tunneled approach ramp to the teller windows was a substantial safety hazard also impelling a change.

\* \* \* \* \* \*

The facts in the instant case support the finding that the purpose of the contested facility was an adjunct or annex to the existing main bank. A substantial part of the "deposited" business from the 18th & Douglas facility was routed to various sectors within the main bank where it was processed. Maintenance of cash at this facility was solely for operating needs and was contained within a detached, reach-in cash chest of one inch steel plate within six inches of factory poured concrete. The security system for this facility was monitored within the main bank rather than at the Police Station as were the systems at the detached facilities. Though the initial management at this facility was somewhat autonomous when this suit was filed, the Court has not deciphered the complicated and enmeshed organizational structure of this integrated operation to be either an overshadowing or preponderant factor. Rather, the functioning of this facility evinces its inherent characteristics of a dependent auxiliary teller office. The operational authority of the 18th & Douglas facility emanates from and is actively supervised by the officers located within the main bank.

\* \* \* \* \* \*

The 18th & Douglas facility did not expand in a material way customer access in a geographical area not previously served, nor is the facility so situated physically as to give The Omaha National Bank a material competitive advantage in securing customers. Only customer convenience and the safety of the customer and local traffic, both pedestrian and automobile, have been affected. The customer must still walk or drive to approximately the same area.