DAKOTA NATIONAL BANK AND
TRUST CO., a National Banking
Association, Plaintiff,

v.

FIRST NATIONAL BANK AND TRUST
COMPANY OF FARGO, a National
Banking Association and James Smith,
Comptroller of the Currency, Defendants.

No. A3–75–40.

United States District Court,
D. North Dakota,
Southeastern Division.

June 18, 1976.

John D. Kelly, Vogel, Vogel, Brantner & Kelly, Fargo, N.D., for plaintiff.

Charles A. Feste, Conmy, Feste & Bossart, Ltd., Fargo, N.D., for First Nat. Bank; Rodger Nordbye, Faegre & Benson, Minneapolis, Minn., of counsel.

Harold O. Bullis, U.S. Atty., Fargo, N.D., for James Smith; Rex E. Lee, Asst. Atty. Gen., Harland F. Leathers, Susan P. Engleman, Dept. of Justice, Dorothy S. Kulig, Gary L. Ryan, Office of Comptroller of Currency, Washington, D.C., of counsel.

## MEMORANDUM OF DECISION AND ORDER

BENSON, Chief Judge.

### STATEMENT OF THE CASE

On May 9, 1975, the Comptroller of the Currency (Comptroller), after an adversary hearing, approved the application of Defendant First National Bank and Trust Company of Fargo, a National Banking Association (First National), to establish a branch on South University Drive in Fargo, about three miles away from its banking house. Plaintiff Dakota National Bank and Trust Company, a National Banking Association (Dakota National), brought this action alleging:

> "The approval of the First National application by the Comptroller of the Currency was arbitrary, capricious and unlawful. Specifically, in view of the provisions of § 6–03–13.1 through § 6–03–13.4 of the North Dakota Century Code [NDCC] approval of the proposed First National branch in south Fargo is contrary to 12 U.S.C. 36."

The relief requested by Dakota National is a declaration that in view of NDCC § 6–03–13.1 through § 6–03–13.4, the branch is prohibited by 12 U.S.C. § 36, and that the Comptroller be enjoined from issuing a branch certificate and First National be enjoined from establishing and operating a banking facility at the proposed branch location.

Dakota National's jurisdictional allegation is worded:

"The amount in controversy exceeds the sum or value of $10,000.00 exclusive of interest and costs. Jurisdiction and venue are established under the provisions of Chapter 2, Title 12 of U.S.C. including 12 U.S.C. 36 and 94, and under 5 U.S.C. 701 et seq and 28 U.S.C. 1331, 1394, 2201 and 2202."

The matter is before the Court on motions for summary judgment filed by each of the three parties. The Comptroller included in his motion attached certified copies of the administrative record compiled on the application of First National to establish a branch on South University Drive; certified copies of his administrative record compiled on the application of First National to redesignate its branch at 404 Main Avenue (4th and Main), Fargo, as an extension of the bank's main office; and an affidavit of Deputy Comptroller Richard J. Blanchard giving the Comptroller's reasoning in re-characterizing the facility at 4th and Main as an extension of the bank's main office.

Dakota National included with its motion for summary judgment an affidavit by its attorney identifying an attached exhibit as the administrative file of the Comptroller relating to the 1971 application of First National to establish and operate a branch at 4th and Main.[1] It also included an affidavit of A. M. Eriksmoen, President of Dakota National, identifying an attached First National newspaper advertisement relating to alleged banking services offered by First National at its three facilities. Defendants have moved to strike the affidavits and exhibits.

On application, leave was granted to Gilbert W. Ellwein, North Dakota Commissioner of Banking and Financial Institutions, to file an amicus curiae brief.

## STANDING

■ Defendants have raised an initial issue of whether Plaintiff has standing to sue in this proceeding. They argue that since Dakota National has the same right to establish a drive-up installation as an extension of its main facility as does First National, that Dakota National cannot have been injured, thereby depriving this Court of jurisdiction since there is no Art. III case or controversy.

Plaintiff, which has operated a branch on South University Drive since 1962, has alleged it will "sustain irreparable injury, damage and loss of its banking business, particularly with regard to business conducted at its South University Drive branch facility . . .."

Defendants' argument goes to the merits and the question of standing is independent of the merits. In this case, it is clear the Plaintiff has standing. *See Association of Data Processing Service Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## STANDARD OF REVIEW

Initially, it is necessary to first determine the appropriate standard of review. The thrust of Plaintiff's case is the allegation that the Comptroller's certificate authorizing the branch on South University Drive in effect allows First National to operate two branches which, under state law, would not be allowed to a state bank and under 12 U.S.C. § 36 and the doctrine of competitive equality would thereby be denied to national banks.

■ On December 23, 1974, First National was notified the Comptroller had approved its requested redesignation of the

---

1. Upon redesignation in 1974 of the 4th and Main facility as an extension of the main bank, First National surrendered the branch certificate.

4th and Main facility as an extension of the bank's existing main banking operation. On December 26, 1974, First National made application for the South University branch. If Plaintiff's action is an appeal from the Comptroller's redesignation of the 4th and Main facility and the Comptroller's subsequent approval of a branch on South University Drive, the proper standard of review is set out in *Camp v. Pitts,* 411 U.S. 138, 141–142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973).

> "[T]he proper standard for judicial review of the Comptroller's adjudications is not the 'substantial evidence' test which is appropriate when reviewing findings made on a hearing record, 5 U.S.C. § 706(2)(E). Nor [is] the reviewing court free to hold a *de novo* hearing under § 706(2)(F) and thereafter determine whether the agency action was 'unwarranted under the facts.' It is quite plain from our decision in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, [91 S.Ct. 814, 28 L.Ed.2d 136] (1971), that *de novo* review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions.

> \*    \*    \*    \*    \*    \*

> The appropriate standard for review [is], accordingly, whether the Comptroller's adjudication was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' as specified in 5 U.S.C. § 706(2)(A). In applying that standard, the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts, supra.*

Conversely, if this is not an appeal from the Comptroller's adjudication, this Court is not bound by the narrow "arbitrary and capricious" standard, but should take evidence and adjudicate the issue of whether First National is entitled to operate a branch on South University Drive. *Nebraskans for Ind. Banking v. Omaha Nat. Bank,* 530 F.2d 755, 761 n. 5 (8th Cir. 1976). In

that case, the Circuit Court reviewed the decision of the District Court under the clearly erroneous rule since the District Court had reached its decision based on evidence admitted at a trial on the merits.

Determination of the proper scope of review is not ended by construing Plaintiff's action to be an appeal. The agency's adjudication is usually a mixed question of law and facts. Some courts hold that the factual determinations of the agency are to be reviewed by the narrow arbitrary and capricious standard, but the legal conclusion reached by the agency (in this case, that the Auto Bank is not a branch) must be judged by the "rightness" test, that is, whether the Comptroller's legal conclusion that the Auto Bank was not a branch was legally correct. This is a broader scope of review involving a *de novo* determination of the legal issues.

*Seattle Trust & Savings Bank v. Bank of California, N.A.,* 492 F.2d 48 (9th Cir. 1974) is cited as authority by Plaintiff in support of its position that this Court should review the Comptroller's legal conclusion by a *de novo* determination based on the record and additional affidavits. This still involves an appeal from the agency ruling but allows a broader scope of review of the legal conclusion reached. In *Seattle Trust, supra* at 50, the Court states:

> "The arbitrary and capricious standard has been judicially fashioned to protect against the wrongful exercise of discretion by the Comptroller regarding factual controversies. In this case, however, the principal issue was whether the Comptroller has acted within the limitations imposed upon him by federal and state law, not whether he has acted reasonably or unreasonably. If the Comptroller was incorrect in his interpretation of the law, he should have been overruled in the District Court. *First National Bank of Logan, Utah v. Walker Bank & Trust Co.,* 385 U.S. 252, 87 S.Ct. 492, 17 L.Ed.2d 343, reh. den., 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1966). This standard of review has been customarily applied to cases involving interpretation of 12 U.S.C.A. § 36(c). See *First National Bank v.*

*Dickinson,* 396 U.S. 122, 90 S.Ct. 337, 24 L.Ed.2d 312 (1966)."

In the case now before this Court, Plaintiff was a party in an adversary proceeding before the Comptroller relating to the South University Branch application, and over First National's objection, was permitted to offer evidence and argument on the question of whether the 4th and Main facility was a branch. The decision of the Comptroller was adverse to the Plaintiff, and it initiated this action naming the Comptroller as a party defendant, seeking, in part, declaratory and injunctive relief against the Comptroller. In addition, Plaintiff, citing *Seattle Trust* as authority, contends the scope of review is a *de novo* review of the Comptroller's legal determination. In any event, Plaintiff has taken an appeal from the decision of the Comptroller, and the question for the Court is whether to follow *Seattle Trust* and delineate between the questions of fact and law determined by the Comptroller or to review the Comptroller's adjudication only under the arbitrary and capricious standard.

In *Camp v. Pitts, supra,* the Supreme Court said the "de novo review is appropriate only where there are inadequate factfinding procedures in an adjudicatory proceeding, or where judicial proceedings are brought to enforce certain administrative actions." *Id* 411 U.S. at 141, 93 S.Ct. at 1244. Plaintiff does not contend either that the factfinding procedures utilized by the Comptroller were inadequate or that this action is a proceeding brought to enforce certain administrative action.

In *Camp v. Pitts, supra* at 142, 93 S.Ct. at 1244, the Court stated that the "appropriate standard for review [is] . . . whether the Comptroller's *adjudication* was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law' . . . ." (Emphasis added). An adjudication is defined as "agency process for the formulation of an order." 5 U.S.C.

§ 551(7); *Bricklayers, Masons & Plasterers Int. U. of Am. v. N. L. R. B.,* 155 U.S.App. D.C. 47, 475 F.2d 1316, 1318 (1973). "[A]djudication is judicial rather than legislative in nature . . . , has an accusatory flavor and may result in some form of disciplinary action . . . , and is concerned with issues of fact under stated law . . . ." *American Express Company v. United States,* 472 F.2d 1050, 1055, 60 C.C. P.A. 86 (1973). "[A]djudication resembles what courts do in deciding cases . . . ." 1 Davis, Administrative Law Treatise 287 (1958). Applying these principles, this Court concludes that the United States Supreme Court in *Camp v. Pitts, supra,* intended that on an appeal from the Comptroller's administrative action, the review of both factual determinations and legal conclusions are to be under the "arbitrary and capricious" standard. This is consistent with the authority vested in the Comptroller under 12 U.S.C. § 36(c) and the expertise to be expected from the Comptroller. Since this case involves a "specific application of a broad statutory term in a proceeding in which the agency administering the statute must determine it initially, the reviewing court's function is limited." *N. L. R. B. v. Hearst Publications,* 322 U.S. 111, 131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).[2]

Plaintiff does not allege the Comptroller misinterpreted the law, either federal or state. Nor does Plaintiff allege the Comptroller's determination of the facts was in error. In essence, it is Plaintiff's position that the facts do not support the Comptroller's decision, and, as applied, resulted in a violation of state and federal law. Under these circumstances, this Court is limited to the *Camp v. Pitts* " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law' " standard. Consequently, the focal point for examination must be the administrative record as it existed at the time of the Comptroller's decision.

---

**2.** The initial determination of "whether a proposed enlargement of a national bank is a 'branch' is a question of federal law to be determined initially by the Comptroller and reviewed by the federal courts." *Driscoll v. Northwestern National Bank of St. Paul,* 484 F.2d 173, 175 (8th Cir. 1973).

**1166**

## THE RECORD

■ Defendants' motion to strike the administrative record of the 1971 application of First National for authority to operate a branch at 4th and Main (later designated an extension of the main bank), which administrative record was made part of Plaintiff's motion for summary judgment, is based on Defendants' contention that the administrative record relating to the proceedings on the application for redesignation of the facility at 4th and Main and the application for a branch on South University Drive, together with the affidavit of Richard Blanchard, are the only relevant records to be considered by the Court. Defendants argue it would extend the review beyond the *Camp v. Pitts* standard if the Court were to consider the earlier record. The Court rejects this argument and finds that Plaintiff's Exhibit is a copy of the Comptroller's administrative record on the 1971 application of First National to establish the 4th and Main facility as a branch, and being a relevant record of the Comptroller's earlier action, under the *Camp v. Pitts* standard, is within the scope of review by this Court. The motion to strike the earlier record is denied. The Eriksmoen affidavit with the 1975 newspaper advertisement is clearly evidence not in the administrative record, and the motion to strike that evidence is granted.

The record that must be the focal point of this Court's review is comprised, then, of Plaintiff's Exhibit 1, consisting of the Comptroller's administrative file of the 1971 application by First National to establish a branch facility at 4th and Main, Defendants' Exhibit A, consisting of the Comptroller's certified copy of the file pertaining to the 1974 application of First National to establish a branch bank on South University Drive, Defendants' Exhibit B, consisting of the 1974 application of First National to redesignate the branch facility at 4th and Main as an extension of the bank's main office, and the Blanchard affidavit.

The record was compiled in the following manner: On September 22, 1971, First National applied to the Comptroller of the Currency for permission to establish a branch facility to be located at the intersection of Main Avenue and Fourth Street, Fargo, North Dakota. The summary of information apparently submitted by First National to the Comptroller indicated the proposed branch would be located two blocks east and two blocks south of the main office, at a distance of 1,075 feet. The service proposed to be offered was:

"deposits and withdrawals from checking and savings accounts, the sale of savings certificates, travelers checks, bank drafts, cashier's checks and bank money orders. Customers [would] be able to make loan payments . . . and applications [would] be accepted for commercial and real estate loans and after approval by staff members, the loans will be handled at the facility.

\* \* \* \* \* \*

The Head Office faces imminent prohibition of left turns for traffic off Broadway into the present drive-in facility which is an integral part of the Head Office building and the possible curtailment of all vehicular traffic on Broadway which is the principal street of downtown Fargo on which the Head Office is located. The bank desires to establish the proposed branch to alleviate the crowded and congested conditions at its drive-in facility and thus offer its customers more efficient and quicker service. The proposed facility will also help the bank to remain competitive." Plaintiff's Exhibit 1.

No protests were filed to this application after due notice was given and permission was granted to establish a *branch* at 4th and Main on October 27, 1971.

At the time the application was made and approval given, North Dakota law allowed a national bank doing business in this state to

"maintain and operate separate and apart from its banking house one facility for drive-in and walk-up service, whereat the services rendered shall be limited to receiving deposits of every kind and nature,

cashing checks or orders to pay, issuing exchange, and receiving payments payable at the bank." NDCC § 6–03–13.1 (1963).

"No bank may maintain or operate under sections 6–03–13.1 through 6–03–13.4:

(1) . . .

(2) Such a facility located more than *fifteen hundred feet* from its banking house . . . ." NDCC § 6–03–13.2 (1963) (Emphasis added).

The North Dakota Legislature amended these statutes in 1973 to provide:

"Every bank organized under Chapter 6–02, and under the supervision of the state banking board, and any national bank doing business in this state, may, upon compliance with sections 6–03–13.1 through 6–03–13.4, maintain and operate separate and apart from its banking house one facility for drive-in and walk-up service, in addition to such service at its main banking house, and at its paying and receiving stations, if any. Such facility shall be within the corporate city limits of the main banking house *or within three miles* of such city but shall not be within the corporate limits of another city. The services rendered at the separate facility shall be limited to receiving the deposits of every kind and nature, cashing checks or orders to pay, issuing exchange, and receiving payments payable at the bank." NDCC § 6–03–13.1 (1975) (Emphasis added).

"No bank may maintain or operate under sections 6–03–13.1 through 6–03–13.4:

1. More than one such facility separate and apart from its banking house

. . .

2. Such facility separate and apart from its banking house without first having obtained the approval of the state banking board or the comptroller of the currency, as the case may be." NDCC 6–03–13.2 (1975).

The McFadden Act, 12 U.S.C. § 36 (1970), incorporates state law setting forth limits upon a national bank's maintenance and use of branch facilities.[3]

On July 25, 1974, First National made an *ex parte* application to the Comptroller of the Currency for permission to withdraw the authority to operate the facility at 4th and Main as a branch and to have it redesignated an extension of the main banking house. This was based principally on the "liberalization" by the State Legislature of the distance from the main facility a branch office could be located and because:

"1. Both are located within the core of downtown Fargo. The Drive-in facility is separated from the main banking house by a distance of only 550 feet.

2. The only structure located between the main banking house and the drive-in facility is a seed warehouse located on railroad right-of-way.

3. The only property located between the main banking house and the drive-in facility consists of railroad right-of-way and a dedicated street. There is no private property.

4. At the time the drive-in facility was constructed, both economics and customer convenience dictated that it not be located adjacent or any closer to the main banking house.

---

**3.** 12 U.S.C. § 36, in pertinent part, provides:

"*§ 36 Branch banks.*

The conditions upon which a national banking association may retain or re-establish and operate a branch or branches are the following:

\* \* \* \* \* \*

c. A national banking association may, with the approval of the Comptroller of the Currency, establish and operate new branches: (1) Within the limits of the city, town or village in which said association is situated, if

such establishment and operation are at the time expressly authorized to State banks by the law of the State in question; and (2) at any point within the State in which said association is situated, if such establishment and operation are at the time authorized to State banks by the Statute law of the State in question by language specifically granting such authority affirmatively and not merely by implication or recognition, and subject to the restrictions as to location imposed by the law of the State on State banks."

5. The site selected was the only practical available site on which to locate the drive-in facility." Defendants' Exhibit B at 031–032.[4]

Without notice to competing financial institutions and without conducting a hearing, the Comptroller of the Currency gave its approval to First National on December 23, 1974, for it to continue to operate its Auto Bank at 4th and Main as an extension of its main office. The branch certificate under which it had previously been operating was returned to the Comptroller and cancelled.

4. Other factors submitted by First National in support of its application to redesignate the 4th and Main facility as an extension of the main office and hence were factors in evidence in the administrative files were:

"1. *Mail.* All mail from the bank is addressed to and received at the main banking house. Any mail that is applicable to the drive-in facility is handled by the appropriate department head pertaining to that phase of the banking operation. Only one address, that of the main banking house, is used as a return address on all outgoing mail from the bank. No correspondence to any customer is originated by drive-in personnel at the drive-in facility.

2. *Telephone.* The switchboard at the main banking house receives all incoming calls and distributes these calls to the appropriate departments including the drive-in facility.

3. *Logo.* All signage, stationery, forms, calling cards and other symbols are identical with no distinction between the main bank and the drive-in facility.

4. *Management.* No management level operating staff is present at the drive-in facility, nor are management level decisions made by the tellers located there. Policies concerning personnel are established by the personnel department located at the main bank. No individual at the drive-in facility answers questions pertaining to loans or investments.

5. *Status of Tellers.* Tellers at the drive-in facility report to the operations officer located in the main bank. All tellers at the drive-in facility have had training experience at the main bank under the supervision of a head teller. Tellers are rotated and substituted freely between the main bank and the drive-in. The duties of the tellers are the same at either location.

6. *Control.* No single officer has over-all responsibility for the drive-in facility. The maintenance officer handles both locations as does the single operations officer and the personnel officer. All three are headquartered in the main banking house. On Saturday when the main bank is closed, junior officers are assigned on a rotation basis to be present and field questions concerning operations from the tellers at the drive-in.

7. *Cash.* The drive-in facility handles approximately 60 per cent of the bank's cash transactions. As excess cash builds, it is transferred daily or more frequently to the main bank vaults by a local armored car service. Coin is delivered daily to the drive-in facility by bank messengers from the main bank as required to meet customer's needs.

8. *Parking spaces.* A nominal number of parking spaces is available at the drive-in facility. They are used primarily by more elderly customers of the bank who like the convenience of transacting business at the drive-in location, but who are apparently apprehensive about using automated equipment or conversing through electronic speakers.

9. *Records.* No separate accounting records are maintained of the activity of the drive-in facility. All operating input and output records are transported back and forth daily by means of bank messenger. The daily cash balancing is a part of the main bank operating procedure and drive-in differences are located, if possible, by a staff from the main bank. All signature cards are maintained in the main bank.

10. *Night Depository.* Night and letter-drop deposit facilities at the main bank and drive-in facility are keyed to open with the same pass keys. The service is interchangeable and customers may deposit their night depository bags at either facility and are able to pick up the bags at either facility. All records for the night depository are maintained at the main office.

11. *Loans.* No loans are transacted at the drive-in facility. Customers who are in need of the loan function of the bank are referred to the main bank. Any payments not of the regular monthly coupon variety normally handled by teller are referred to the appropriate department in the main banking house.

12. *Limited Service.* The drive-in facility handles only paying and receiving transactions. It does not provide safety deposit boxes, notary service, collections, loans or the sale of securities. It is not intended to be a 'full service' location.

13. *Meals.* Employees at the drive-in facility walk daily to the main office to use the cafeteria located there for their noon meal.

14. *Combined Use.* Recently a portion of the building housing the drive-in has been in use as an office for the marketing department of the bank. The head of that department handles the marketing for the entire bank, as well as serving as a regional marketing representative for the parent organization."

Defendant's Exhibit B at 010–012.

The Blanchard Affidavit before this Court states the reasons for the Comptroller's decision as follows:

"On July 25, 1974, the First National Bank and Trust Company (hereinafter 'First National'), a national banking association whose main office is located in Fargo, North Dakota, requested that the Office of the Comptroller of the Currency reexamine First National's drive-up installation located at 404 Main Avenue, Fargo, North Dakota, then operating as a branch, for the purpose of recharacterizing the installation as an extension of First National's main office premises.

On August 8 and August 15, First National communicated further information to the Office of the Comptroller of the Currency regarding this proposed recharacterization.

From the information supplied on the above three dates, the Comptroller's Office concluded:

(a) First National was unable to continue to provide drive-up service for its customers at its main office in 1971 because of urban renewal plans to turn the sole access street into a pedestrian walkway;

(b) Discontinuation of drive-up service would subject First National's customers to the inconvenience of 'horse and buggy day banking' after they had become accustomed to the convenience and efficiency of the drive-up service now routinely provided by banks throughout the nation;

(c) Physical modifications to the existing main office premises to provide drive-up service were unfeasible;

(d) No other property contiguous to First National's main office premises was available for expansion;

(e) The only reasonably available premises upon which First National could continue to provide drive-up service to its customers was a tract of land located approximately 550 feet (168 meters) from the existing main office premises, and, out of necessity, this was purchased for the purpose of relocating the unusable drive-up installation;

(f) The only intervening structure at ground level was a building scheduled to be razed pursuant to urban redevelopment plans;

(g) the only intervening property was a railroad easement and a dedicated street;

(h) The drive-up installation would continue to provide limited service to First National's existing customers in the main office service area;

(i) All transactions entered into at the drive-up installation would be processed at the main office;

(j) The drive-up installation would be completely dependent upon the main office and could function only in conjunction with the main office to enable First National to continue to provide modern, convenient service to its existing customers; and

(k) The operation of the drive-up installation had resulted in no injury to any of First National's competitors and had not affected the competitive balance in the market.

In determining whether an additional installation, adjunctive to an existing main office, amounts to the establishment of a branch or merely an extension of the existing main office premises, the Comptroller of the Currency examines all of the facts and circumstances surrounding the additional installation.

The factors weighed by the Comptroller of the Currency include, but are not limited to, the distance separating the additional and existing installations, the presence or absence of any intervening structures, the presence or absence of any physical connection, the economic effect of the additional installation upon the balance of competition within the banking community, and the feasibility of placing the additional installation closer to the existing office. No single factor is controlling."

On December 26, 1974, First National made application to the Comptroller for a

certificate to operate a proposed facility on South University Drive between the avenues of 28th and 29th as a branch. Notice of the application was published in a local newspaper, and notice was given to local competing financial institutions and to the North Dakota Department of Banking and Financial Institutions. Pursuant to this notice, Plaintiff advised the Comptroller in writing on February 6, 1975, that it was opposed to the application and that it requested a hearing. An adversary hearing was held February 28, 1975, at which both parties to the instant action were present and represented by counsel. After an investigation by the examiner from the Comptroller's office, approval of the application to operate a branch facility followed.[5]

### CONCLUSION

The Court concludes Plaintiff has failed to meet its burden of showing by a preponderance of the evidence that the Comptroller's ruling is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.

### RATIONALE

■ Summary judgment is appropriate only where the moving party conclusively demonstrates that there is no genuine issue of material fact and that the movant is entitled to prevail as a matter of law. F.R. Civ.P. 56. *Kroger v. Omaha Public Power District*, 523 F.2d 161, 162 (8th Cir. 1975). There are cross motions for summary judgment in this case and no genuine issues of material fact.

The "arbitrary and capricious" standard of review to which the Court is limited has been commented on by the Court of Appeals, Eighth Circuit.

"The 'arbitrary and capricious' standard of review is a narrow one. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, [28 L.Ed.2d 136] (1975). Its scope is more restrictive than the 'substantial evidence' test which is applied when reviewing formal findings made on a hearing record. *See Camp v. Pitts*, supra, 411 U.S. at 141, 93 S.Ct. 1241 [36 L.Ed.2d 106]; *Webster Groves Trust Co. v. Saxton*, supra, 370 F.2d at 387; *Charlton v. United States*, 412 F.2d 390, 398 (3d Cir. 1969) (Stahl, Circuit Judge, concurring). 'Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis.' *Carlisle Paper Box Co. v. N. L. R. B.*, 398 F.2d 1, 6 (3d Cir. 1968). Something more than mere error is necessary to meet the test. *N. L. R. B. v. Parkhurst Manufacturing Co.*, 317 F.2d 513, 518 (8th Cir. 1963). To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was 'willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case  *  *.' 73 C.J.S. Public Administrative Bodies and Procedure § 209 at 569 (1951)." *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1376 (8th Cir. 1974).

A heavy burden has been placed on those who contend a Comptroller's decision to be arbitrary or capricious. The Court must determine whether Plaintiff has met this burden in light of *Nebraskans for Ind. Banking v. Omaha Nat. Bank, supra.* (*Nebraskans*).

In *Nebraskans*, the Eighth Circuit, sitting en banc, held that where the detached drive-in and walk-up office facility offered most customary banking services; accepted deposits; cashed checks; made noncommercial loans; was a custom-built, free-standing building located approximately one block from the main bank's entrance; unattached to the main bank; separately staffed; with a separate telephone listing;

5. The Comptroller did not make formal findings on the hearing record, but "[i]t is undisputed that neither the National Bank Act nor the Administrative Procedure Act requires the Comptroller to make formal findings of a hearing record." *First National Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1378–1379 (8th Cir. 1964), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1655, 44 L.Ed.2d 86 (1975).

and maintained somewhat longer public hours than did the main bank, the detached facility was a branch of the main bank and not merely an extension of its operation, notwithstanding the fact that there was a pneumatic tube connecting the two buildings, and the fact that the detached facility did not offer safe deposit boxes, trust services, international banking or commercial loans. *Nebraskans* did not involve an appeal from the Comptroller's ruling, which relieved the Court from the narrow "arbitrary and capricious" standard of review.[6]

The McFadden Act defines the term "branch" as follows:

"(f) The term 'branch' as used in this section shall be held to include any branch bank, branch office, branch agency, additional office, or any branch place of business . . . at which deposits are received, or checks paid, or money lent." 12 U.S.C. § 36(f).

The United States Supreme Court has held that

"the term 'branch bank' at the very least includes *any* place for receiving deposits or paying checks or lending money apart from the chartered premises; it may include more. . . . [T]he offering of any one of the three services mentioned in that definition will provide the basis for finding that 'branch' banking is taking place." *First National Bank v. Dickinson*, 396 U.S. 122, 135, 90 S.Ct. 337, 344, 24 L.Ed.2d 312 (1969).

In *Nebrakans*, the Eighth Circuit noted: "It is established that what constitutes a 'branch' is a question of federal law, not controlled by state law definitions, *First National Bank v. Dickinson*, 396 U.S. 122, 133, 90 S.Ct. 337, 24 L.Ed.2d 312 (1969); *Driscoll v. Northwestern National Bank*, 494 F.2d 173, 175 (8th Cir. 1973), but the determination must be made on the facts of each case, not according to a fixed test. *North Davis Bank v. First National Bank*,

457 F.2d 820, 824 (10th Cir. 1972)." *Nebraskans, supra* at 759.

and

"[T]he Supreme Court's use of the phrase 'apart from the chartered premises' was not intended to classify every free-standing facility as a branch. *Virginia ex rel. State Corporation Commission v. Farmers & Merchants Bank*, 380 F.Supp. 568, 572 (W.D.Va.1974), *aff'd per curiam*, 515 F.2d 154 (4th Cir.), *cert. denied*, 423 U.S. 869, 96 S.Ct. 133, 46 L.Ed.2d 99, 44 U.S.L.W. 3205 (1975). However, lack of physical connection to the main bank is obviously a necessary though not sufficient characteristic shared by all facilities 'apart from the chartered premises.'" *Nebraskans, supra* at 760.

*Nebraskans* involved the law of Nebraska which permitted state chartered banks to maintain one "attached" and two "detached auxiliary teller offices", Neb.Rev.Stat. § 8–157 (Supp.1974). It also involved application of a Nebraskan banking regulation providing that a pneumatic tube connecting the two detached facilities did not convert the detached facility into an attached facility.

The North Dakota statute authorizes drive-in and walk-up service at the main banking house and a similar service at a facility separate and apart from its main banking house within the corporate city limits of the main banking house or within three miles of such city but not within the corporate limits of another city.

It is undisputed that deposits are received and checks paid at the 4th and Main facility. Nor is it disputed that the facility is free standing and located some two blocks distant. *Nebraskans* held that "a free-standing facility located around the corner one block up and across the street from the main bank's south entrance . . . even if connected by a pneumatic tube, is one located 'apart from the chartered premises'

---

**6.** "As this is not an appeal from the Comptroller's ruling, we are not bound by the narrow 'arbitrary and capricious' standard of review. Cf. *Sterling National Bank v. Camp*, 431 F.2d 514, 516 (5th Cir. 1970), *cert. denied*, 401 U.S.

925, 91 S.Ct. 879, 27 L.Ed.2d 829 (1971); *Dunn v. First National Bank*, 345 F.Supp. 853, 857 (N.D.Ga.1972). *See also Mid-West Nat'l Bank v. Comptroller*, 296 F.Supp. 1223, 1226 (N.D.Ill. 1968)." *Nebraskans, supra* at 761, n. 5.

as a matter of law." *Nebraskans, supra* at 763. In the instant case, the only physical connection between the Auto Bank and the main office is a direct telephone line.

■ However, other factors as an aid to the factfinder and that were considered by the Comptroller in this case in analyzing the circumstances of a particular case have been approved.

"The cases considering the factual question whether a given national bank facility is a 'branch' have identified the number of factors to be assessed in making the determination. They include (1) the distance separating the main bank from the added facility; (2) the presence or absence of intervening structures; (3) the physical connection, if any, between the main bank and the facility; (4) the effect upon the balance of competition (that is, whether the facility expands in a material way customer access to banking services in a location not previously served so as to give a material competitive advantage in securing customers); (5) the availability of other locations for attached expansion; and finally (6) the dependence of the facility upon the main bank in day-to-day banking operations." *Nebraskans, supra* at 760–761 (Footnote omitted).

It is settled that the "threshold question of whether a proposed enlargement of a national bank is a 'branch' is a question of federal law to be determined initially by the Comptroller and reviewed by the federal courts. However, the overriding policy of the [McFadden] Act is one of 'competitive equality' between state and national banks." *Driscoll v. Northwestern National Bank of St. Paul*, 484 F.2d 173, 175 (8th Cir. 1973). Thus, consideration of competitive equality is of greater importance than the other factors in determining whether a separate facility is a branch or merely an extension. In addition, "[b]y force of the language of § 36 itself, the fact that a state bank would not be permitted to operate the challenged facility in addition to its other existing facilities, *must take precedence as a decision criterion over the many administratively and judicially conceived factors discussed above.*" *Nebraskans, supra* at 762. (Emphasis added).

In the instant case, the Court has noted the evidence before the Comptroller.

■ The 4th and Main facility is located a relatively short distance from the main office.[7] It is not located so as to introduce the bank services into a new and different area of economic interest. The facility was to provide a drive-in, walk-up service that had been discontinued immediately adjacent to the main bank office upon the opening of Broadway Mall.[8] Based on these factors that were a part of the file of the Comptroller it cannot be said there was no evidence to support the Comptroller's determination that the 4th and Main facility did not alter the important element of competitive equality between state and national banks.[9]

---

7. If measured in a straight line, the distance is approximately 550 feet. Plaintiff would measure the distance as approximately 1250 feet by following the usual route of travel between the two points.

8. A drive-in, walk-up facility is maintained by each of the other three national banks in Fargo in connection with the main banking house of each. Each also maintains a separate such facility apart and more distant from its main banking house. The drive-in, walk-up facility maintained by each in connection with its main banking house varies in the type of structure and distance from the main banking house.

9. Defendants assert that they are entitled to remain in competitive equality with the Bank of North Dakota. NDCC § 6–09–02 (1975) provides in part:

"The industrial commission shall operate, manage and control the Bank of North Dakota, locate and maintain its places of business, of which the principal place shall be within the state, and make and enforce orders, rules, regulations and bylaws for the transaction of its business. The business of the Bank . . may include anything that any bank lawfully may do. . . . ."

Defendants assert that because the Bank of North Dakota is authorized by statute to operate as many branches as it wishes (in spite of the fact that it has operated only one facility during its existence) that national banks may do the same. The Court does not accept this contention. The Bank of North Dakota was

The Commissioner of Banking and Financial Institutions of North Dakota has submitted a brief in opposition to the Comptroller's position. The Commissioner also notified the Comptroller prior to its final determination on the application that "[i]t would appear that [First National], if the Comptroller granted the branch as applied for at University Drive South between twenty-eighth and twenty-ninth avenues in Fargo, Cass County, North Dakota, would be in violation of Section 5155(c) B. Branches of National Banks. Federal Reserve Act, Section 6–03–13.2, North Dakota Century Code, specifically limits that only one facility separate and apart from its banking house is authorized." To this the Comptroller responded,

"On December 23, 1974, the Comptroller of the Currency ruled that the Bank's established 'Auto Bank Branch' at 404 Main Avenue, Fargo, North Dakota, constituted an extension of banking premises rather than a branch. Therefore, it appears that the present application is legal under North Dakota law." Defendant's Exhibit A at 133.

■ The North Dakota State Banking Board is the administrative agency responsible for approving separate facilities for state banks. The Commissioner is not an administrative agency and he has no authority to act separately from the State Banking Board in an individual capacity. *First American State Bank & Trust Company v. Ellwein*, 198 N.W.2d 84 (N.D.1972). The letter from the Commissioner does not show that the Comptroller was aware of a determination by the State Banking Board that in the latter's opinion the proposed South University branch would constitute the operation of two branches. Rather, it appears that the Comptroller believed the North Dakota Commissioner was merely unaware of the Comptroller's prior ruling that the Auto Bank was not a branch, thereby allowing First National to establish the South University Drive facility. Since the Commissioner made no further response to the Comptroller concerning his opinion as to the legality of the proposed branch, the administrative record did not contain evidence that in the opinion of the State Banking Board, the proposed facility was illegal under state law. Thus, contrary to *Nebraskans*, the Comptroller had no indication that the North Dakota State Banking Board, the sole authorizing agency, would not allow a state bank to operate facilities similar to those requested by First National. It is the view of this Court that under the North Dakota statutes a state bank in circumstances similar to that in which the First National has found itself would be permitted to operate similar facilities.[10]

authorized by a constitutional amendment that provides, in part, that the state may make internal improvements and may engage in any industry, enterprise or business excepting the manufacture, sale and disposition of intoxicating liquors. Article 32 Amend. N.Dak. Constitution. Its status is that of an agency of the sovereign power. *Sargent County v. State*, 47 N.D. 561, 182 N.W. 270 (1921). As such it enjoys certain privileges and immunities not similarly shared by banks organized under NDCC Chapter 6–02. *See Paulus v. State of South Dakota*, 58 N.D. 643, 227 N.W. 52, 54 (1929). On the other hand, the Bank of North Dakota is restricted by statute from making loans to individuals except upon real estate and warehouse receipts, *State v. Dakota Nat. Bank of Dickinson*, 52 N.D. 98, 201 N.W. 851 (1924), and from making real estate loans to nonresident farmers, *Hendrickson v. Syverson*, 82 N.W.2d 827 (N.D.1957). NDCC § 6–09–15 (1975). Based on these factors the Court holds

that the term "State banks" as used in 12 U.S.C. § 36(c) and as defined in 12 U.S.C. § 36(h) does not include the Bank of North Dakota but rather that the concept of competitive equality was meant to preserve competition between national banks and state banks in North Dakota organized under NDCC Chapter 6–02 only.

**10.** There are no court decisions or authority, other than the opinion of the North Dakota Commissioner of Banking and Financial Institutions expressed in his amicus curiae brief filed with this Court, holding that a state bank would not be permitted, under similar circumstances, to operate the same type facilities that have been permitted to First National. For the Comptroller and the federal courts to be bound by the opinion of the Commissioner would be an extreme illustration of a situation described by Judge Lay in his concurring opinion in *Nebraskans* as the "tail wagging the dog".

**1174**

The narrow standard of review available to this Court under *Camp v. Pitts, supra,* does not permit the Court to substitute its judgment for that of the Comptroller as to whether First National should be permitted to open a branch on South University Drive in addition to its main bank and its facility on 4th and Main. It is the Comptroller of the Currency who is charged with administering the McFadden Act, and his adjudication should not be upset in an absence of a showing by a preponderance of the evidence that the decision under the facts of this case was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. The Comptroller's decision is a rational common sense decision rendered on the facts unique to the case.

One point remains to be considered. At the Comptroller's adversary hearing, Plaintiff raised three issues, as follows:

1. Is establishment of the proposed First National branch permissible under applicable North Dakota law?

2. Is there a need for the proposed First National branch and will approval of the branch application prove injurious to existing banking facilities providing primary service to South Fargo?

3. Is establishment of the proposed First National Branch reasonably necessary to maintain or improve First National's competitive position among banking institutions in the Fargo area?

The arguments of the parties in the case before this Court were directed solely towards the issue of whether the branch was permissible under applicable North Dakota law. While Plaintiff may be deemed to have abandoned the remaining two issues, the Court has examined the record and holds the Comptroller's adjudication adverse to the position of the Plaintiff on the two issues is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

IT IS ORDERED that the Motion for Summary Judgment by Defendants First National Bank and Trust Company of Fargo, and James Smith, Comptroller of the Currency, are GRANTED.

IT IS FURTHER ORDERED that summary judgment dismissing Plaintiff's action be entered, and

IT IS FURTHER ORDERED that Defendants' pending motion for a protective order is DENIED.